**WJA REALTY LIMITED PARTNERSHIP,**
**Plaintiff,**

**v.**

**Alan NELSON as Commissioner of the Immigration and Naturalization Service, U.S. Department of Justice, and Ann McLaughlin as Secretary of Labor, U.S. Department of Labor, Defendants.**

**No. 88–0810–CIV–WMH.**

United States District Court,
S.D. Florida,
Miami Division.

March 9, 1989.

Donald Ryce, Coral Gables, Fla., for WJA Realty.

Margery Leiber, for intervenor NLRB.

Jean Mullenhoff, U.S. Atty's Office, Ira Kurzban, Miami, Fla., for intervenor Intern. Jai Alai Players Ass'n.

## ORDER GRANTING PERMANENT INJUNCTION

HOEVELER, District Judge.

This cause comes before the court on Plaintiff's motion for injunctive relief. The relief sought is an order of this court preventing the Immigration and Naturalization Service from enforcing its regulation 8 C.F.R. sec. 214.2(h)(14)(iv). Where the Department of Labor (DOL) certified the strike pursuant to the terms of the regulations, the result was the suspension of the authorizations to work of plaintiff's employees holding H–1 visas. The regulation in question and its history will be discussed hereinafter. The court concludes that the regulation is an impermissible assumption of legislative power which cannot survive examination. The effect of the regulation and its supporting provisions is to run counter to the policy and essential purposes of the National Labor Relations Act and to discriminate against "employees," who would otherwise be protected by the NLRA. While the stated purpose of the offending regulation is to protect "American" labor, it does, in fact, violate the most basic "fair play" and equal treatment principles and, over the long term, actually militates against the workers it purports to protect.

## FACTS

This action concerns the validity of an INS regulation. The World Jai Alai Association Realty Limited Partnership (WJA) brings an action against the Commissioner of the Immigration and Naturalization Service (INS) and the Secretary of the Department of Labor (DOL) seeking to enjoin the application of an INS regulation 8 C.F.R. 214.2(h)(14)(iv) which permits the INS commissioner to revoke the work authorizations of non-resident aliens when a strike occurs. The dispute arises over the INS' suspension of work authorizations of players of Jai Alai at frontons owned by the plaintiff, WJA.

Non-immigrant workers are subject to certain restrictions in the event of a strike at their workplace. If the DOL certifies that a strike "would adversely affect the wages and working conditions of U.S. citizens or lawful resident workers," the INS is required to (1) deny any petition to classify an alien as a non-immigrant under the H-visa status; (2) suspend any H-petition that has been approved and deny admission to the United States of any person who seeks admission based on the suspended petition, and (3) suspend the approval of any petition, where the petition has been approved and the worker has entered the United States, if the worker is not an "employee." The provision of the regulation at issue provides for the suspension of work authorizations of the aliens who are in the United States and are "employees:"

> If a petition has been approved, the beneficiary has entered the United States to take up employment, and if the beneficiary is an "employee" within the definition of the NLRA; the existence of a strike in the occupation at the place of employment shall result in the suspension of the beneficiary's authorization to work, unless the employer establishes to the satisfaction of the Secretary of Labor or his designee, who in turn certifies to the Commissioner of Immigration and Naturalization of his designee, that less than 30 percent of the work force in the occupation at the place of employment are U.S. citizens or lawful permanent resident workers, provided that the Sec-

retary of Labor or his designee also certifies that the strike has been authorized by a majority or such U.S. citizen or lawful permanent resident workers who voted, or a majority of such workers are participating in the strike.

8 C.F.R. 214.2(h)(14)(iv).

On March 11 and March 14, 1988, the International Jai Alai Players Association (Union) petitioned for representation elections among the players employed by Jai Alai frontons in the state of Florida. On April 14, 1988, the union commenced a strike at a number of jai alai frontons, among them are four frontons that are owned by the plaintiff, WJA.

Ira Kurzban, an attorney for the union, wrote to Thomas Bruening of the Department of Labor informing him of the strike against WJA and requested that the DOL issue a certification under 213.2(h)(14). Mr. Kurzban sent a second letter stating that 79% (75 out of the 94) of the players at the three frontons owned by WJA were lawful permanent residents; 52% (39 out of 75) of these lawful permanent residents were on strike.

On April 19, the DOL notified WJA that the union had requested a strike certification and that certification would be sent to the INS, unless the WJA responded by April 20. After receiving a request from WJA for an extension of time, the DOL gave WJA until April 22 to respond. WJA provided the following information in a letter dated 21, 1988:

At the Miami, Tampa, and Fort Pierce frontons, more than 30% of the players in the roster at the commencement of the strike were U.S. citizens or lawful permanent residents. We are without any knowledge as to whether to strike was authorized by a majority of U.S. workers or lawful permanent residents. However, it appears that a majority of such workers are participating in the strike. With regard to the Ocala frontons, less than 30% of the players on rosters at the commencement of the strike are U.S. citizens or lawful permanent residents. In Ocala, all U.S. citizens or lawful permanent residents continue to perform and

therefore a majority of such workers did not authorize the strike and are not otherwise participating in the strike.

Based on this information, the DOL issued a strike certification to the INS on April 22 applying to all four frontons owned by WJA. Based on this certification, on May 3, 1988, the INS issued a notice of suspension of the work authorizations of the alien temporary workers employed at the four frontons.

Between April 22 and May 3, both WJA and IJAPA submitted additional information concerning the work stoppage to DOL. WJA asserted that the strike was not supported by the majority of U.S. citizens and permanent residents. No lists of names were provided. IJAPA asserted that it was the burden of the employer to prove non-majority participation. On April 29, the DOL agreed to met with both parties in Washington and requested documentation. On May 3, the DOL and INS representatives met in turn with IJAPA and WJA. It was agreed that at the time of the strike 37 person did not strike. The parties did not agree as to who should be included as a "person in the occupation" at the time of the strike, nor on the number of strikers. The INS provided an interpretation of subsection iv which directed that replacement workers were not to be considered as citizen/residents. On May 5, DOL received additional information from WJA on players which it contended should be included in the counting of citizen/residents.

The DOL determined that there were 79 citizen/resident players at the time of the strike. As of April 14, 39 of the players struck; 40 did not strike. About April 25, two employees joined the strike. Replacement workers are not counted.

On May 6, 1988, WJA Realty Limited Partnership and Felipe Hurtado filed a complaint against Alan Nelson, Commissioner of the Immigration and Naturalization Service, and Ann McLaughlin, Secretary of Labor, U.S. Department of Labor. The complaint was titled "a complaint for injunctive relief," and requested a temporary restraining order. The complaint sets forth the basic facts leading up to the

suspension of work authorizations. It states three counts: (1) the defendants' actions violated substantive due process; (2) their actions violated the due process requirements of the Administrative Procedure Act; (3) the regulation in invalid as not authorized by the Immigration and Nationality Act. Felipe Hurtado, the individual plaintiff, voluntarily dismissed himself from the action on May 13. The plaintiff now requests leave to seek a permanent injunction.

The initial parties and intervenors have submitted several memoranda on the regulation and the context within which it is challenged. WJA in its complaint sought a temporary restraining order. At a hearing on May 6, 1988, the court denied the temporary restraining order in an oral ruling. The court held a hearing on May 13, 1988 on the preliminary injunction. Subsequently, the court requested that the defendants submit a proposed order and the plaintiff submit its opposition. The court indicated that it was intending to deny the preliminary injunction at that time.

The defendants have moved for summary judgment. The plaintiff has moved for emergency consideration of a preliminary injunction or, in the alternative for a written order. The plaintiff has also moved to amend its complaint only to seek a permanent injunction rather than the preliminary relief previously sought.

The International Jai Alai Players Association (Union) has intervened in the action. It asserts that the validity of the regulation is not before this court and, in the alternative, that the regulation is valid.

The National Labor Relations Board has intervened asserting that the regulation is invalid for it permits the INS to interfere with the rights of employees. The court has granted the NLRB leave to intervene.

ISSUES:

The motions pending present several issues [1]:

A. Whether the amended claim for a permanent injunction is before this court, when the plaintiff sought only a preliminary injunction in the original complaint.

B. Whether the NLRB is a proper intervenor when it is has not yet filed a claim under rule 8(a).

C. Whether the regulation 214.-2(h)(14)(iv) is a valid exercise of the Attorneys General's authority to regulate the conditions of stay of an alien.

DISCUSSION:

This case concerns a regulation which permits the INS to suspend the work authorizations of nonimmigrant workers in the United States on H–1 and H–2 visas, when a strike is in effect at the workplace. The Jai Alai players who were suspended from working in this case hold H–1 visas.

A. Permanent Injunction as remedy

■ The defendants and the Union argue that a request for a permanent injunction is not before the court. The plaintiff requests leave to amend to add a request for a permanent injunction. Rule 15 of the Federal Rules is designed to allow parties to amend freely, unless the adverse party would be unduly prejudiced. *Hall v. Natural Supply Company*, 270 F.2d 379, 383 (5th Cir.1959). The defendants will not be prejudiced, for the allegations in the complaint have put them on notice of the facts and the disputed regulation. *See* Fed.Rule Civ.Pro. 8(a). Indeed, the positions of all the parties have been fully argued at the most recent hearing held on December 20, 1988.

Even if the party does not plead a specific count or request for a form of relief, the court may grant the relief warranted by the facts as alleged generally and under other counts. A plaintiff "is entitled to any relief which the court can grant, regardless of whether it asks for the proper relief." *Dotschay v. National Mutual Insurance Company*, 246 F.2d 221, 223 (5th Cir.1957). *See Irizarry v. Palm Springs General Hosp.*, 657 F.Supp. 739, 741 (S.D.

---

[1]. Because of the basis of this court's ruling declaring the regulation invalid as not reasonably related to the enabling statute, the court need not address the plaintiff's claims for due process under the Administrative Procedure Act and under the Constitution.

Fla.1986). The resolution of the serious conflict arising from the enforcement of the disputed regulation warrants the court's decision on the request for a permanent injunction.

It is, therefore, ORDERED AND ADJUDGED that the plaintiff's motion for leave to amend to seek a permanent injunction is granted. The request for such relief is now properly before the court.

**B. Requirements for intervention of NLRB**

The National Labor Relations Board has moved to intervene in this action pursuant to rule 24(a) and (b). The court granted the motion. The intervenor International Jai Alai Players Association (IJAPA) objects to the intervention on the grounds that the NLRB has failed to file a pleading. The NLRB has filed a motion for permanent injunction articulating its position.

■ The issue presented at this stage is whether the court should require the NLRB to file a responsive pleading. Federal Rule 24(c) provides that an intervenor should file a motion to intervene along with "a pleading setting forth a claim or defense." Judicial interpretation of this rule has been liberal and the courts have held that the proper approach to the rule is to disregard non-prejudicial defects. *Spring Construction Co., Inc. v. Harris*, 614 F.2d 374, 377 (4th Cir.1980). Failure to file an accompanying pleading, however, may be rectified by the later filing of such a pleading. *Spring Construction* at 377. One court has held that the pleading that must accompany the motion to intervene should be a 7(a) pleading. *Sanders v. John Nuveen & Co.*, 463 F.2d 1075 (7th Cir.1972). The purpose of requiring an intervenor to file a pleading is to place the other parties on notice of the position, claim, and relief sought by the intervenor. *See Spring Construction.* Accordingly, an adequate pleading to intervene is not necessarily limited to a rule 7(a) pleading.

■ Although The NLRB has not filed a complaint, which is the requisite 7(a) pleading a party in its position would file, NLRB's motion for permanent injunction

sets forth the facts, the NLRB's position, and its desired relief. Such a pleading provides adequate notice to the parties. Although the initial complaint filed by the plaintiff does not request a permanent injunction, the function of a complaint, as discussed above, is to provide fair notice to the adversary of the nature and basis of the claim asserted. *Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (3d Cir.1942). As discussed above in section A, such relief was and is properly before this court.

It is, therefore, ORDERED AND ADJUDGED that the NLRB has properly intervened and that its motion and memorandum has provided adequate notice to the parties of its claim.

**C. Validity of regulation**

The plaintiff contends that the underlying INS regulation pursuant to which the strike certification was issued, 8 C.F.R. sec. 214.2(h)(iv), is invalid because it is unauthorized by the Immigration and Nationality Act and has no reasonable relationship to Congressional intent regarding labor policy as established by the National Labor Relations Act.

*1. The relationship between the regulation and the statute*

a. INS authority over immigrants

The Attorney General has the authority to admit an alien as a nonimmigrant to the United States "for such time and under such conditions" as regulation may provide. 8 U.S.C. sec. 1184(a). This authority extends to those aliens seeking admission to the United States to perform permanent, 8 U.S.C. sec. 1182(a)(14), as well as temporary services or labor, 8 U.S.C. sec. 1101(a)(15)(H)(ii). The Attorney General has delegated his authority under the Act to the Commissioner of the Immigration and Naturalization Service. *See* secs. 1103(a), 1184(c), and 100.2.

The control of admissions of foreigners is "an inherent attribute of national sovereignty," and "the political branches of the federal government have plenary authority

to establish and implement substantive and procedural rules governing the admission of aliens to this country." *Jean v. Nelson,* 727 F.2d 957, 964 (11th Cir.1984), *aff'd.* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The executive, therefore, has two sources of authority in the immigration field:

(1) power delegated by Congress through statutes such as the INA and (2) its inherent power, arising out of the Executive's plenary authority over foreign relations.

*United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). The effect of this dual grant of authority is to permit Congress "to make remarkably broad delegations of its authority in the immigration field." *Jean,* 727 F.2d at 965.

██ In many contexts, the Attorney General has authority to regulate the admission of aliens and the conduct of aliens who are in the United States. *See, e.g., Narenji v. Civiletti,* 617 F.2d 745, 747 (D.C.Cir.) (INS reporting requirements for non-resident alien students held to be directly and reasonably related to Attorney General's duty under INA). "The central concern of the INA is with the terms and conditions of admission to this country and the subsequent treatment of aliens lawfully in the country." *De Cana v. Bica,* 424 U.S. 351, 359, 96 S.Ct. 933, 938, 47 L.Ed.2d 43 (1976). Aliens acquire only the "limited status" established by the regulations and statutes and they have no constitutional right to work without authorization. *Pilapil v. INS,* 424 F.2d 6, 11 (10th Cir.), *cert. den.* 400 U.S. 908, 91 S.Ct. 152, 27 L.Ed.2d 147 (1970). "A host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other." *Matthew v. Diaz,* 426 U.S. 67, 78, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976).

The objective of the INA is "to prescribe the terms and conditions on which they [non-immigrants] may come in or on which they remain after having been admitted, to establish the regulations for deporting such aliens as have entered in violation of law or who are here in violation of law, and to commit the enforcing of such laws and regulations to executive officers." House Report No. 1365, 1952 U.S.Code Cong. & Ad.News 1653, 1654.

b. The nature of H–1 and H–2 Visas

Section 101(a)(15) of the Immigration and Nationality Act, 8 U.S.C. sec. 1101(a)(15), provides as follows:

The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens ... (H) an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform services of an exceptional nature requiring such merit and ability ... or (ii) who is coming temporarily to the United States (a) to perform agricultural labor or services ... of a temporary or seasonal nature, or (b) to perform other temporary services or labor if unemployed persons capable of performing such services or labor capable of performing such services or labor cannot be found in this country ...

Temporary worker nonimmigrant classification came into existence with the passage of the Immigration and Nationality Act of 1952. Congress repealed all Immigration and Nationality laws then in effect and completely revised the code after careful consideration of relevant policy issues. Congress determined that through Section 212(a)(14), 8 U.S.C. sec. 1182(a)(14), the new legislation provided "strong safeguards for American labor." S.Rep. 1137, 82nd Cong., 2d Sess., 11 (1952). Section 212(a)(14) provides for the exclusion of certain immigrant aliens seeking to enter the United States to pursue employment, if the Secretary of Labor determines that (a) there are sufficient available workers in the locality of the aliens's destination who are able, willing and qualified to fill the positions, or (b) employment of the aliens will adversely effect the wages and working conditions of similarly employed U.S. workers. According to the Senate Judiciary Committee

chaired by Senator McCarran, "this provision will adequately provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor where the economy of individual localities is not capable of absorbing them at the time they desire to enter this country." *Id.*

Congress carefully limited the relevance of domestic labor concerns to nonimmigrant workers seeking admission in the H-2 category. Section 101(a)(15)(H), 8 U.S.C. sec. 1101(a)(15)(H). Congress gave no role to the Department of labor in the H-1 category. *Id.* In this case, the players whose work authorizations were revoked were H-1 visa holders, not H-2 visa holders. Congress was not concerned with the impact on U.S. labor of H-1 nonimmigrant workers, presumably because the H-1 provision is limited to persons of "distinguished merit and ability," and obviously, such persons would generally have no adverse impact on the domestic labor force.

Congress officially supported this view again in 1970, when it amended the Act and provided for the admission of temporary H-1 workers to fill positions that are permanent in nature. Congress believed that ample federal judicial and administrative case law interpretation of the terms "distinguished merit and ability" would limit the use of the category and thus remove all threat to the U.S. labor force. H.R.Rep. No. 851, 91st Cong.2d Sess. 4 (1970), 1970 U.S.Code Cong. & Ad.News 2750, 2752. Importantly, in 1970 neither the INS nor the Department of Labor raised an objection to the amendment. The labor department did not fear that an influx of H-1 temporary workers would prejudice the rights of U.S. labor. The agency did, however, advise Congress that "labor certification may be useful at a later time if there is admission of H-1 visas in large numbers or in surplus occupations." Hearings Before Subcommittee No. 1 of the Committee on the Judiciary, H.R., "On Nonimmigrant Visas," 91st Cong., 1st Sess. Serial No. 91-9, 124 (1969). Thus, in 1956 and in 1970 Congress presumed that temporary workers would be freely admitted in the H-1 category and did not authorize any restriction of their rights under the National Labor Relations Act (NLRA).

Defendants premise the right of the INS to issue 8 C.F.R. section 214.2(h)(14)(iv) on the language of 8 U.S.C. section 1184, which provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe...." They argue that the Attorney General's regulatory authority extends to the conditions under which a nonimmigrant will be permitted to work, including employment situations where a strike occurs. While they do not expressly address the issue of whether the subject of the regulation is preempted by the NLRA, implicit in the Defendant's legal position is the conclusion that 8 C.F.R. sec. 214.2(h)(14)(iv), like most substantive administrative regulations, should be considered by the courts as having the same force and effect of law as does a statute such as the NLRA.

The problem with the Defendant's approach is that it begs and determines the question of whether the regulation is a valid exercise of authority. The regulation must be rationally related to the INA. *Sam Andrews' Sons v. Mitchell,* 457 F.2d 745 (9th Cir.1972). The Supreme Court has held:

> That an agency regulation is "substantive", however, does not by itself give it the "force and effect of law." The legislative power of the United States is vested in the Congress, and the exercise of quasilegislative authority by governmental departments and agencies must be rooted in grant of such power by the Congress and subject to limitations which that body imposes.... This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to them can be binding on courts in manner akin to statutes. What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued.

*Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 308, 99 S.Ct. 1705, 1718, 1720, 60 L.Ed. 2d 208 (1979). Therefore, INS's foray into the labor arena cannot be considered a legitimate exercise of regulatory authority if it cannot fairly be said that such an exercise of authority is contemplated by the Immigration and Nationality Act.

### c. The regulation as applied to H–1 visa holders

■ The Jai Alai players who play at the plaintiff's frontons have H–1 visas. The plaintiff WJA argues that the regulation is beyond the authority of the Attorney General delegated by the INA and that it is specifically invalid as applied to H–1 visa holders. The issue presented by this argument is whether the regulation 214.-2(h)(14)(iv) is rationally related and within the delegation of authority from Congress under the Immigration and Nationality Act. WJA asserts that since H–1 visa workers have special talent, they would not adversely affect domestic labor. *See* "Memorandum for the Associate Attorney General dated April 18, 1979." 4 O.L.C. 366, reprinted in 56 *Interpreter Releases,* 210 (April 30, 1979). While having a special talent does not necessarily imply that such talent is not adverse to American labor, the statute, as revealed by the legislative history, did not provide for the monitoring of the economic situation in the case of H–1 visa holders as it in the case of H–2 visa holders. As discussed above, Congress gave no role to the DOL in certifying H–1 workers and believed that ample federal judicial and administrative case law interpretation of the terms "distinguished merit and ability" would limit the use of the category and thus remove all threat to the U.S. labor force. H.R.Rep. No. 851, 91st Cong.2d Sess. 4 (1970), 1970 U.S.Code Cong. & Ad.News 2752. Because the Act makes no provision for the protection of the U.S. labor force from temporary workers of distinguished merit, the regulation as applied to H–1 workers is not reasonably related to the act and invalid.

### 2. *Conflict between NLRA and the INA*

■ The regulation is not a valid exercise of the Attorney General's authority, particularly if the regulation squarely conflicts with another statute. That is precisely the problem with 8 C.F.R. sec. 214.-2(h)(14)(iv): its language and its underlying rationale are contrary to, and wholly incompatible with, the Taft–Hartley amendments to the National Labor Relations Act.

### a. The rights of an employee under the NLRA

The National Labor Relations Act "was designed to avert the substantial obstructions to the free flow of commerce which result from strikes and other forms of industrial strife or unrest by eliminating the causes of that unrest." *NLRB v. Hearst Publications,* 322 U.S. 111, 126, 64 S.Ct. 851, 858, 88 L.Ed. 1170 (1944). Prior to the Taft–Hartley amendments, the only protections the National Labor Relations Act afforded employees was for engaging in certain kinds of concerted activities, including strikes and picketing. In 1947, Congress enacted sweeping changes in this country's labor laws, including the amendment of Section 7 of the National Labor Relations Act in order to protect the right of employees to refrain from engaging in activities protected by original section 7. As the NLRB noted shortly after the Taft–Hartley enactments,

> Section 7 of the Act provides that employees "shall have the right to self-organization, to form, join, or assist labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and *shall also have the right to refrain from any of all such activities....*" The purport of the italic phrase is that employees have a guaranteed right to refrain from striking. That right includes the right to go to and from work without restraint of coercion while a strike is in progress. The legislative debates and committee reports on the Labor–Management Relations Act, 1947, contain numerous statements by propo-

nents of the bill confirming this interpretation. *See,* for example, statement of Senator Taft, Ninety–Three Congressional Record p. 4562–3; House Conference Report No. 510 on H.R. 3020, at p. 42, and Sec. 12(a) of H.R. 3020 as passed by the house.

*International Longshoremen's and Warehousemen's Union, Local 6 (Sunset Line and Twine Company),* 79 NLRB No. 207, 23 LRRM 1001 (1948).

The primary impetus for the enactment of a comprehensive national labor law was the need to stabilize labor relations by "equitably and delicately structuring the balance of power among competing forces so as to further the common good." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 286, 91 S.Ct. 1909, 1917, 29 L.Ed.2d 473 (1971). In finding that aliens who were crewmen on foreign ships in domestic waters were completely outside the NLRA's coverage, the Supreme Court reasoned that the NLRA was intended "as a bill of rights ... for American workingmen." *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 144, 77 S.Ct. 699, 703, 1 L.Ed.2d 709 (1957).

Section 7 of the act gives employees the right to strike: "employees shall have the right ... to engage in ... concerted activities for the purpose of ... mutual aid or protection." *See NLRB v. Allis–Chalmers Co.,* 388 U.S. 175, 181, 87 S.Ct. 2001, 2007, 18 L.Ed.2d 1123 (1967). Section 8(a)(1) makes it unfair for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7." 29 U.S.C. § 158(a)(1). To protect the rights of employees from union coercion, employees have the right "to refrain from any or all such activities." 29 U.S.C. § 157. The aim of this amendment was to ensure that "employees have a guaranteed right to refrain from striking." *International Longshoremen's and Warehousemen's Union,* 79 NLRB 1487, 1504 n. 27 (1948).

It has been repeatedly recognized by the courts that legal weapons of self-help, whether a union's right to strike or an employer's right to continue to operate during that strike, are "part of the balance struck by Congress between the conflicting interest of the union, the employees, the employer and the community." *Teamsters Local 20 v. Morton,* 377 U.S. 252, 259, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964). An employer retains the right to utilize certain economic weapons to resist a strike regardless of the fact that most strikes are protected by section 7 of the NLRA. *See Machinists v. Wisconsin Emp. Rel Comm'n,* 427 U.S. 132, 152–53, 96 S.Ct. 2548, 2558–59, 49 L.Ed.2d 396 (1976).

Under the regulation in question, the alien worker is not entitled to choose between working or striking; it simply eliminates the right of an alien employee to make the choice once the strike is certified. Here, the balance is tipped in favor of the union at striking frontons, since, as indicated, the aliens may not work once the strike is certified. The language of the regulation, superficially, at least, tips the scales heavily in favor of the union, since the presence of 30% american/permanent resident labor and the requirement of 50% strike support of that amount permit a small number of the labor force to prevent the aliens from working.

### b. Rights of aliens generally

It is against the framework of the national labor policy that the validity of 8 C.F.R. sec. 214(h)(14)(iv) must be judged. Although the Attorney General has received a broad grant of authority in the immigration field, the Attorney General in exercising this authority must accommodate the rights that aliens are granted by the constitution or by federal statutes. Aliens in the United States are entitled to a limited group of rights and privileges, and this court must determine whether the rights afforded to "employees" generally is to be afforded to the plaintiff's players and to take precedence over the regulatory power of the INS, sought to be imposed in this case. Aliens as well as citizens, within the jurisdiction of the United States "shall have the same right in every state and territory ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by

white citizens...." *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971) (Citing *Takahashi v. Fish & Game Commission,* 334 U.S. 410, 419 n. 7, 68 S.Ct. 1138, 1143 n. 7, 92 L.Ed. 1478 (1948)). "Any person within the United States, citizen or alien, resident or non-resident, is protected by the guarantees of the Constitution." *Sam Andrews' Sons v. Mitchell,* 457 F.2d 745, 749 (9th Cir.1972).

Subsections (i), (ii), and (iii) of the regulation at issue regulate the granting of visas and the placing of conditions upon entry in the United States while a strike is in progress. Subsection (iv), however, is directed at aliens who are "employees." The NLRB argues that because the INS regulation requires the alien to cease working if the strike is certified, it is in conflict with the rights employees are entitled to under the NLRA. Once the alien is permitted to work, the alien has the rights to which an employee is entitled.

### c. Aliens as employees

The plaintiff and NLRB argue that since undocumented aliens have been held to be "employees" and entitled to the protections of the NLRA, legal aliens are "employees" as well. In *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 892, 104 S.Ct. 2803, 2808, 81 L.Ed. 2d 732 (1984), the Supreme Court held that undocumented illegal aliens were "employees" within the NLRA. In *Sure–Tan,* the employer notified the INS of the illegal status of its alien workers, after its employees had elected a union. As a result of the employer's retaliatory action, five employees voluntarily left the country. *Id.* at 886–87, 104 S.Ct. at 2805–06.

■■ The act provides that the term "employee" shall "include any employee, ... subject only to certain specifically enumerated exceptions." *Id.* at 891, 104 S.Ct. at

2808. The NLRB's construction of the term "employee" is entitled to considerable deference and should be upheld if it is "reasonably defensible." *Id.* The court in *Sure–Tan* found that extending coverage of the act to illegal aliens furthers the purposes of the NLRA:

> If undocumented alien employees were excluded from participation in union activities and from protections against employer intimidation, there would be created a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers....

*Id.* at 892, 104 S.Ct. at 2809.[2]

### d. The regulation and rights of "employees" under the NLRA

Suspending the work authorization of alien employees removes the rights they are entitled to as "employees". The defendants argue that the regulation is a valid exercise of the INS' authority to control the use of temporary alien workers to prevent such workers from acting as strike breakers. A strike breaker is a new employee hired for the purpose of replacing a striking employee. Such a rationale does not apply to those workers who are already in the United States and working at the time the strike commences; they are not replacing a striking employee, for they were there working when the strike commenced. The rationale is relevant to subsections (i), which permits denial of petition for classification as a non-immigrant alien under H status, (ii), which permits suspension of petition and denial of admission to U.S., and (iii), which permit the INS to suspend petitions for aliens who are in the country but are not employees. An H-visa holder who is already working cannot be a strike breaker since he already has a job and is an employee.

---

**2.** The court in *Sure–Tan* found no conflict between the NLRA and the INA because it was not unlawful to hire illegal alien. *Id.* at 892–93, 104 S.Ct. at 2808–09. Congress has since revised the INA and has made it unlawful to hire undocumented aliens. The Immigration Reform and Control Act of 1986 (IRCA), Public Law 99–603, 8 U.S.C. 1101 *et seq.* The NLRB argues that the amendments to the INA do not affect the definition of what constitutes an "employee." This

court notes that while IRCA does change the analysis of that section of *Sure–Tan,* it does not change the conclusion that "employee" under the NLRA is a broad term and its inclusion of non-resident aliens is consistent with the immigration laws. The court in *Sure–Tan* found that, with respect to undocumented aliens, the policies of the NLRA were compatible with those of the INA. *Id.* at 893–94, 104 S.Ct. at 2809–10.

The defendants also argue that the employee rights of an alien are illusory, for the alien will not be able to make a choice. Without the regulation, the aliens will have to choose to work, since choosing to strike and not to work would subject them to deportation for being out of status. To that extent, the balance in a labor dispute would weigh unfairly in favor of the employer.

The regulation as it stands, however, does not give the alien any choice at all. He cannot choose to strike or to work.[3] He is forced to stand idle. The language of the statute also permits a small percentage of American labor to determine whether a large percentage of aliens who are already working shall continue to work. The regulation presents a clear example of "the tail wagging the dog."

While it is clear that the Attorney General has the authority to regulate the entry and conditions of stay of aliens, it is equally clear that, once properly admitted in this country, the aliens have constitutional and statutory rights. However, rights may be circumscribed because of the aliens' status. The problem presented in cases of this type is the definition of such rights. In this particular case the additional problem presented is the collision between what the court perceives to be a basic "employee" right under the NLRA and the regulation in question.

The plaintiff's employees entered the country legally and were working at the time of the strike. Because of the regulation in question, a small percentage of employees can determine whether a strike can be authorized regardless of the position of the considerable majority of employees. The problems created by this patent incursion into the arena of labor policy are further highlighted by the provision in the regulation which, upon strike certification, changes the employees status and ends the

right to work. All this without so much as a word from the alien employee.

Defendants argue that this regulation is designed to protect American labor. Careful consideration of the regulation demonstrates that such protection is essentially superficial. Indeed, the long term consequence of enforcement of the regulation would be detrimental to american labor. Employers could, by selectively hiring aliens, insure that the 30% american/resident labor requirement could not be met. They could eliminate the possibility of strike and essentially hold hostage the foreign employees, while excluding american employees. At present, the employees are hostage to both employer and union.

CONCLUSION:

The court is in agreement with the positions advanced by the Plaintiff and the National Labor Relations Board. Perhaps the most effective demonstration of the danger of an executive branch exceeding the scope of its rule making authority is the examination of the regulation in question. It produces an essentially unfair result and patently runs counter to the policies of the NLRA. Because this assumption of authority was beyond the legislative grant afforded Defendants, the regulation must be declared invalid.

In conformity with the foregoing discussion, it is

ORDERED AND ADJUDGED that the INS regulation at 8 C.F.R. sec. 214.2(h)(iv) is held invalid as not rationally related to the Immigration and Nationality Act and as in direct conflict with the National Labor Relations Act. The defendants shall perform all such acts as are necessary to conform to the conclusion above stated, including the revalidation of work authori-

---

**3.** It is, at least, questionable if under the INA a striking worker (striking properly and in conformity with applicable labor laws) ceases to be working and in compliance with the VISA requirements. Striking employees, however, do not lose their employee status under the NLRA. See NLRB v. Fleetwood Trailer Co., 389 U.S. 375,

378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967). Indeed, the more reasonable approach would be to conclude that the striking individual remains an employee and considered working until the resolution of differences or other legal termination of the dispute.

zations which have been suspended by the application of the regulation.

DONE AND ORDERED.