**UNITED STATES of America, Plaintiff,**

v.

**CITY OF HIALEAH; Raul L. Martinez, Mayor (in his official capacity); Hialeah Personnel Board; Dan Greenfield, Personnel Director (in his official capacity); Dade County Police Benevolent Association, Inc.; and Hialeah Association of Firefighters, Local 1102 of the IAFF, AFL–CIO, Defendants.**

**No. 94–1140–CIV.**

United States District Court,
S.D. Florida.

Aug. 16, 1994.

Alejandro Vilarello, City Attorney, Hialeah, FL, Michael Braverman, Senior Staff Attorney, Dade County Police Benevolent Ass'n, Miami, FL, Robert D. Klausner, Klausner & Cohen, P.A., Hollywood, FL, Robert A. Sugarman, Sugarman & Susskind, P.A., Miami, FL, for defendants.

Brenda Berlin, U.S. Dept. of Justice, Civil Rights Division, Employment & Litigation Section, Washington, DC, for plaintiff.

### ORDER DENYING APPROVAL OF SETTLEMENT

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon a hearing, held August 11, 1994, to determine the fairness of a proposed settlement agreement entered into by Plaintiff United States of America ("United States") and Defendants City of Hialeah, its Mayor, Personnel Board, and Personnel Director (collectively, the "City"). For the following reasons, the Court withholds approval of the proposed settlement agreement.

### PROCEDURAL BACKGROUND

In 1992, the United States began an investigation of the City's hiring practices for its police and fire departments. In its investigation, the United States received and reviewed numerous documents from the City relative to its hiring practices, conducted interviews, and performed statistical analyses. On May 18, 1993, the United States informed the City of its determination that the City had engaged in a pattern or practice of employment discrimination against blacks because of their race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Specifically, the United States alleged that the City utilized written examinations in the selection of candidates for appointment to entry-level police officer and firefighter positions that had an adverse impact upon blacks, and that the examinations had not been shown to be job-related and consistent with business necessity.

Thereafter, although denying any discriminatory conduct on its part, the City entered into a settlement agreement (the "Agreement") with the United States. On June 7, 1994, the United States commenced the above-styled action in this Court with the filing of a complaint for racial discrimination against the City. Both the United States and the City, however, moved the Court to tentatively approve the settlement agreement reached between them. The proposed settlement agreement provided, in pertinent part:

(1) That the City shall not engage in any act or practice that has either the purpose or effect of discriminating unlawfully against any black employee, applicant for employment, or potential applicant for employment with the City's Police and Fire Departments because of such individual's race. The City further agrees not to retaliate against or adversely affect any person because of that person's race, or because that person has opposed discriminatory policies or practices, or because of that person's participation in or cooperation with the initiation, investigation, litigation or administration of the instant action or the Agreement.

(2) That the City shall implement a recruitment program directed toward increasing the number of black police officers and firefighters in its Police and Fire Departments in numbers that reflect their availability and interest in the relevant labor market.

(3) That the City shall immediately begin development of written police officer and written firefighter examinations which meet criterion validity. The development and validation of these written examinations shall be conducted by a professional outside consultant. The newly developed written examinations shall: (a) have no adverse impact on test-takers on the basis of race, national origin, or sex; or (b) be demonstrably job-related for the positions in question and consistent with business necessity.

(4) That the City shall provide priority employment to fifteen (15) former black police officer applicants and fifteen (15) former black firefighter applicants identified pursuant to the terms of the Agreement. The City shall hire eighteen (18) of the thirty (30) black individuals being offered employment within six (6) months after the Court finally approves the individual relief awarded pursuant to the Agreement (9 individuals in each department).

(5) That individuals who accept priority employment pursuant to the terms of the Agreement shall be entitled to remedial retroactive seniority in that job as of six (6) months from the date that the individual filed his or her original application for employment, and seniority shall be credited for all purposes for which seniority is used by the City (including promotions, job bidding, pay, reductions in force, shift assignments, vacations, and accrual of annual leave). Individuals who accept offers of priority employment pursuant to the terms of the Agreement shall also be entitled to full pension benefits as though such individuals had been appointed on their remedial seniority dates.

(6) That the City shall also provide a monetary settlement of $450,000.00 to be disbursed as back pay relief to all individual claimants determined to be eligible for such relief under the terms of the Agreement.

On June 8, 1994, the Court granted the United States and the City's joint motion for entry of stipulation and settlement agreement, and tentatively approved the Agreement pending a fairness hearing on the matter, scheduled for August 11, 1994.[1] Notice of the hearing and proposed settlement was published, and any objections to said settlement were required to be filed no later than thirty (30) days prior to the scheduled hearing date.[2]

On June 29, 1994, upon motion of the United States, the Dade County Police Benevolent Association, Inc. ("PBA") and the Hialeah Association of Firefighters, Local 1102, (the "Union") were added as party-defendants to the action.[3] Shortly after their joinder, the PBA and the Union filed their respective objections to the proposed Agreement. Both essentially asserted that the City, by failing to bargain with the PBA and the Union over the terms of the Agreement, has violated the law and impinged upon the rights bargained for by incumbent employees under the respective collective bargaining agreements.

Contemporaneously with the filing of the PBA and the Union's objections, 201 City police officers (the "Suau objectors") filed a "motion to intervene and notice of

---

1. The concept of a "fairness hearing" arises from *Fed.R.Civ.P.* 23(e), which requires court approval of class-action settlements, and has since been carried over into the realm of Title VII cases. *See, e.g., O'Hara v. City of Tallahassee Police Dept.*, 1982 WL 464 (N.D.Fla.1982).

2. The Civil Rights Act of 1991 precludes challenges to a consent judgment, resolving employment discrimination claims, by a person who, prior to entry of a consent decree, had sufficient actual notice of the proposed settlement and an opportunity to present objections. 42 U.S.C. § 2000e–2(n)(1)(B).

3. In its motion, the United States averred that it was not alleging any violation of Title VII on the part of the joined defendants, but that their joinder was required "for the purposes of ensuring that the relief provisions in the Agreement may be fully implemented." Neither the City, the PBA, nor the Union opposed the joinder. The court notes, however, that the PBA and the Union were not parties to the Agreement.

objections."[4] The Suau objectors claim entitlement to intervenor status as a matter of right in that their expectations regarding job tenure and benefits would be adversely affected by the proposed Agreement. In addition, the Suau objectors challenged the Agreement on the basis that the United States had not made a sufficient showing of discrimination to justify such an Agreement. They further protest the remedial retroactive seniority provision of the Agreement, and the hiring of police officers from the victim class absent an objective measure of their qualifications. At the fairness hearing, the Court, in its discretion, granted the Suau objectors' motion to intervene. *See Howard v. McLucas*, 782 F.2d 956, 959 (11th Cir.1986) (A generalized expectation of consideration for promotion is sufficient to confer standing to intervene.). Therefore, pursuant to *Fed. R.Civ.P.* 24(a), the Suau objectors have the same rights as the original parties in this action. *New York News, Inc. v. Newspaper and Mail Deliverers' Union*, 139 F.R.D. 291, 293 (S.D.N.Y.1991), *aff'd*, 972 F.2d 482 (2d Cir.1992).[5]

In addition to the foregoing objections, several written objections were also received from persons **not** parties to the action. First, an objection was filed by Sunday Ezomoghene, charging that the number of blacks to be hired should be increased to fifty (50), and that examinations should not be allowed at all. Second, Officer Caraballo objected that, insofar as it related to the City's fire department, the Agreement should contemplate, and remedy, discrimination against Hispanics.[6] Third, a number of objections

were received which solely opposed the remedial retroactive seniority provision of the Agreement.[7] As previously mentioned, a fairness hearing was held on August 11, 1994, to address the propriety of the settlement agreement, and to consider these objections.

## DISCUSSION

█ In a fairness hearing, the burden is on the plaintiff to show that race-conscious relief sought in a settlement agreement is warranted. Once the plaintiff meets this burden, the Court must determine the propriety of the agreement. Then, approval of such relief must be given or withheld. *See Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977).

### A. *Validity of the Race–Conscious Relief.*

█ The parties to the Agreement must first demonstrate a valid basis for the race-conscious relief sought in the Agreement. Essentially, the Court need not make a formal finding that the City discriminated against blacks; it need only find that the City has a strong basis to believe that such discrimination occurred. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986). The requisite evidentiary basis for race-conscious relief exists if there is sufficient evidence to establish a *prima facie* case of discrimination in violation of Title VII. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989). Moreover, the parties to the Agreement must also show that the relief sought in the settlement

---

4. Although the actual motion states that it is filed on behalf of "198 sworn police officers," the names accompanying the motion number 201. The first such name is Raul Suau.

5. The Court notes that the Suau objectors did not accompany their motion for intervention with "a pleading setting forth a claim or defense" as required by *Fed.R.Civ.P.* 24(c). This failure may be rectified by the later filing of such a pleading. *WJA Realty Ltd. Partnership v. Nelson*, 708 F.Supp. 1268, 1272 (S.D.Fla.1989). Upon the filing of the Suau objectors' pleading, their alignment as plaintiffs or defendants in this action will become ascertainable.

6. Officer Caraballo appeared at the fairness hearing and stated that he had mailed a written objection within the time limit and that he had a

certified return receipt for the mailing. Neither the Court nor the United States have received this written objection. Nevertheless, the Court allowed Officer Caraballo to voice his objections at the hearing.

7. Specifically, the Court received letters from five individual objectors and also received a single objection containing 53 signatures. The five individuals, who are members of the City's fire department, are: (1) Luis Espinosa; (2); Karl J. Odin; (3) Ruben D. Martinez; (4) Edward Hernandez; and (5) Anthony P. Carnevale. The group of 53 objectors, all of whom are also City firefighters, label themselves "Concerned Constituents of The City of Hialeah."

agreement is narrowly tailored toward remedying the alleged discrimination. *Id.* at 507–08, 109 S.Ct. at 729–30.

A plaintiff can establish a *prima facie* case of discrimination by showing that there is a "significant statistical disparity between the racial, sexual or ethnic balance and composition of an employer's workforce and that of the community from which the workers are hired." *United States v. Alexandria,* 614 F.2d 1358, 1364 (5th Cir.1980). *See also Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1551 (11th Cir.1994). More specifically, a gross statistical disparity must exist between the number of minorities in the available labor pool and the number of minorities employed by that particular employer. *Maryland Troopers Ass'n v. Evans,* 993 F.2d 1072, 1077–78 (4th Cir.1993).

In the instant case, the Court finds that the parties to the Agreement have met their burden in establishing a *prima facie* case of discrimination against blacks by the City. Here, the United States proffered statistical evidence, through the affidavit of Marian Thompson, Ph.D., a statistician for the Department of Justice, which showed a gross disparity between the number of blacks employed in the City's police and fire departments and the representation of blacks in the relevant labor market. Specifically, for the period of January 1, 1987 to July 27, 1994, the City realized a total shortfall of 16 to 17 persons, between the number of black police officers it hired and the number expected to be hired. Likewise, with regard to the number of black firefighters hired during the same 1987 to 1994 period, the City realized a shortfall of 14 to 15 persons. The United States also proffered statistical evidence that the entry-level police and firefighter examinations had an adverse impact on blacks, with pass rates of only 25.2% and 67.2% respectively.[8] Moreover, the City presented no evidence as to the validity of these exams; i.e., how they related to the job being sought.

Based upon the foregoing, the Court finds, without question, that a gross statisti-

cal disparity exists. The Court also finds, upon review of the proposed Agreement, that the Agreement is narrowly tailored to remedy the City's alleged discrimination.

B. *Propriety of the Agreement.*

1. *Standard of Review.*

In this regard, the Court notes that voluntary settlement has long been recognized as the preferred means of resolving Title VII cases and eliminating employment discrimination. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). The law is equally well established, however, that, because "the settlement process is more susceptible than the adversarial process to certain types of abuse ... a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511, 1516–17 (M.D.Ala.1994) (citing *Pettway,* 576 F.2d at 1169). In addition, the court has a duty to ensure that the settlement is not illegal or against public policy. *Alexandria,* 614 F.2d at 1362.

In assessing the propriety of a settlement agreement, the Court must consider the nature of the litigation and the purposes to be served by such an agreement. *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981). Moreover, the Court "should focus on the terms of the settlement, considering the merits only insofar as they are relevant in determining the probable outcome of the litigation, and thus give some indication of the fairness and justice of the settlement." *Moore v. City of San Jose,* 615 F.2d 1265, 1271 (9th Cir.1980). Where the settlement mandates make-whole relief in the form of remedial retroactive seniority, courts should,

> take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis

---

**8.** Pass rates for white police and firefighter exam-takers for the same time period were 61.9% and 95.9%, respectively. Results for His-

panic test-takers were 35.4% and 88.2%, respectively.

from that point; ... such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of unusual adverse impact arising from facts and circumstances that would not be generally found in Title VII cases.

*Franks v. Bowman Transp. Co.*, 424 U.S. 747, 779 n. 41, 96 S.Ct. 1251, 1271 n. 41, 47 L.Ed.2d 444 (1976).[9] This requirement of "unusual adverse impact" has generally been found where incumbent employees will be displaced, i.e., laid off or "bumped," by the installment of the victim class. *See Romasanta v. United Air Lines, Inc.*, 717 F.2d 1140 (7th Cir.1983), *cert. denied sub nom, McDonald v. United Air Lines*, 466 U.S. 944, 104 S.Ct. 1928, 80 L.Ed.2d 474 (1984). Other factors that may be considered are whether the number of the victim class is small enough so as to have minimal impact on the seniority rights of incumbent employees, *Moore*, 615 F.2d at 1271–72, and whether the influx of new employees would be gradual, as opposed to immediate, *Bockman v. Lucky Stores, Inc.*, 1986 WL 10821, at *5 (E.D.Cal. Aug. 11, 1986), *aff'd*, 826 F.2d 1069 (1987). In addition, factors such as the number of incumbent employees, the alternatives available to them, and the economic circumstances of the industry may also be relevant. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 376 n. 62, 97 S.Ct. 1843, 1875 n. 62, 52 L.Ed.2d 396 (1977).

*2. Analysis.*

At the outset, the Court notes that all parties to this action, and all objectors, either agree with or do not dispute the majority of the provisions in the Agreement.[10] With the exception of the objections raised by Sunday Ezomoghene and Officer Caraballo, the main contention seems to arise solely with regard to the remedial retroactive seniority provision.[11] The Court has carefully considered the opinions of those who made their objections known, and the United States' response thereto. The Court addresses these objections below in determining the propriety of the Agreement.

### a. Propriety as to Non–Consenting Parties

Prior to the fairness hearing held in this matter, the United States joined, pursuant to *Fed.R.Civ.P.* 19(a), the PBA and the Union as party-defendants to this action. The United States, however, did not obtain the PBA's and the Union's consent to the proposed Agreement, and the PBA and the Union now object to the approval of said Agreement. In addition, the Suau objectors, who are also parties to this action, have objected to approval of the proposed Agreement.

▮▮▮ The Court finds that approval in the face of these objections would not be appropriate because the Court cannot bind non-consenting *parties* to a consent decree. *City of Miami*, 664 F.2d at 442. In *City of Miami*, as in the instant case, only two parties consented to a decree in a multi-party suit. The trial court approved the consent decree despite the presence of a non-consenting party. The Fifth Circuit stated, "Insofar as the decree does not affect the nonconsenting party and its members, or contains provisions to which they do not object, the trial court properly exercised its discretion in approving it. However, parts of the decree do

9. Two types of seniority are recognized in this regard: benefit-type seniority and competitive-type seniority. *Franks*, 424 U.S. at 766, 96 S.Ct. at 1265. Benefit-type seniority refers to earned economic fringe benefits such as pensions, paid vacation time, and unemployment insurance. Competitive-type seniority refers to "job-related 'rights' that cannot be supplied equally to any two employees;" i.e., promotion, layoff, transfer, demotion, shift assignments, prerogative in scheduling vacation, training opportunities, and working conditions. *Id.* at 766, 782 n. 1, 96 S.Ct. at 1265, 1272 n. 1.

10. Although the Suau objectors also contested the basis upon which the United States and the

City have founded the Agreement, the Court's finding that the United States has shown a *prima facie* case of discrimination by the City disposes of this objection.

11. As to the objections made by Sunday Ezomoghene and Officer Caraballo, the Court finds the response of the United States valid and accordingly, overrules their objections. The objections received from the five individuals, and the single objection received containing the 53 signatures, are limited to the remedial retroactive seniority provision. The Court's analysis relative to the incumbent employees addresses this issue.

affect the third party who did not consent to it, and these parts cannot properly be included in a valid consent decree." *Id.* *See also Martin v. Wilks,* 490 U.S. 755, 768, 109 S.Ct. 2180, 2187, 104 L.Ed.2d 835 (1989) ("A voluntary settlement in the form of a consent decree between one group of employees and their employer cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of employees who do not join in the agreement. This is true even if the second group of employees is a party to the litigation."). Moreover, at a minimum, when the United States' joined the PBA and the Union under Rule 19(a), it should have provided the PBA and the Union with a full opportunity to participate in the formulation of the proposed relief. This it did not do. Such an opportunity would have allowed the PBA and the Union to protect the interests of their members while still providing the victim class with full and complete relief. *See, e.g., EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1095 (6th Cir. 1974). Accordingly, the Court finds that it must withhold approval of the proposed Agreement.[12]

The United States relies on *Moore v. City of San Jose,* 615 F.2d 1265 (9th Cir.1980), and *Bockman v. Lucky Stores,* 1986 WL 10821 (E.D.Cal. Aug. 11, 1986), *aff'd,* 826 F.2d 1069 (1987), in support of its proposition that the Agreement can be approved even in the face of the non-consenting parties' objections. In *Moore,* the plaintiffs brought an action against their employer, alleging discrimination, and eventually joined the union as a party-defendant, alleging discrimination, and breach of duty. The court held an evidentiary hearing, found the union not liable, and dismissed the claims against it. 615 F.2d at 1273. The court never addressed the issue of whether a consent decree can be imposed against non-consenting parties. Thus, *Moore* is inapposite. Moreover, the

Court's holding today can be easily reconciled with the holding in *Lucky Stores.* In that case, the proposed consent decree explicitly "reserved, for the Court, the issue of whether 'full competitive seniority [used to determine promotions, layoffs, etc.], as opposed to benefit seniority [used to determine salary, pension, vacation, etc. rights], shall be a remedy for the instatement procedure.' " 1986 WL 10821, at *1.[13] The court in *Lucky Stores* held a hearing on the issue, after joinder of the union as a necessary party, and thereafter rendered its decision. In this regard, all interested parties were afforded the due process required and became bound by the judicial determination. A review of the proposed Agreement in the instant case, however, reveals a significant difference. Here, the proposed Agreement provides for the remedy of retroactive seniority *without* any explicit reservation of this issue for the Court's judicial determination. All that the United States and the City have asked the Court to do is to pass on the fairness of the Agreement as a whole.

**b. Propriety as to Incumbent Employees**

Even if approval were appropriate, despite the presence of nonconsenting parties, the Court finds that approval must still be withheld because the Agreement, with regard to these parties as well as the objectors with similar interests, is not fair. In the instant case, almost half of the combined workforce of City police officers and firefighters (259 out of 548), have filed objections to the remedial retroactive seniority provision, asserting that such a provision will adversely impact their own rights. In *Franks v. Bowman Transp. Co.,* the Supreme Court stated:

[I]t is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the *expectations* of other, arguably innocent, employees would *if ap-*

---

12. While the Court could give partial approval of the Agreement for all provisions not in dispute, as discussed in *City of Miami,* 664 F.2d at 442, the Court declines to do so at this time. Perhaps the parties may wish to readdress this matter in an appropriate pleading, in light of the overture made by the PBA at the hearing regarding its willingness to work towards a resolution of the present disagreement.

13. The *Lucky Stores* court relied on *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), where the agreement contained a similar reservation to the court. *See also International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

*plied generally* frustrate the central "make whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy.... [W]e find untenable the conclusion that this form of relief may be denied *merely because the interests of other employees may thereby be affected.* "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be *unhappy* about it, there will be little hope of correcting the wrongs to which the Act is directed."

424 U.S. 747, 774–75, 96 S.Ct. 1251, 1269–70, 47 L.Ed.2d 444 (1976) (citation omitted) (emphasis added). The Court in *Franks* recognized, however, that an award of retroactivity seniority may not be appropriate in every case. *Id.* at 779, 96 S.Ct. at 1271. Moreover, in a later case, the Court emphasized that:

Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable."

*Teamsters,* 431 U.S. at 375, 97 S.Ct. at 1875 (citations omitted).

The Court finds that the objections raised in the case *sub judice* stem not so much from the fact that the incumbent employees are "unhappy" with the proposed settlement because their "expectations" will not be realized, but more from the fact that their **vested, contractual rights** will be diminished. This is not merely a case in which "disappointed" incumbent employees are being asked to share the burden in curing the City's alleged discrimination, but in which the relief sought "disrupts settled 'rights and

expectations.' " *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1561 (11th Cir. 1994) (citation omitted). Indeed, the United States conceded at the hearing the existence of a present potential for the denial of or interference with these vested rights.[14]

Based on the anticipated effect of the remedial retroactive seniority provision upon incumbent employees, the Court finds that the Agreement creates the "unusual, adverse impact" contemplated by *Franks,* and is not "fair." The United States argues that this case does not meet the "unusual, adverse impact" threshold necessary for disapproval of the Agreement. The United States relies on the following numerical data: (1) a maximum of 15 out of 90 firefighters (38% of the present workforce); and a maximum of 15 out of 126 police officers (40% of the present workforce), who have been hired since 1987, are at risk of being "bumped" as a result of the remedial retroactive seniority provision; and (2) only 73 out of the 201 Suau objectors fall within the "at-risk" population. These figures are misleading. The overwhelming number of incumbent employees strongly opposing the remedial retroactive seniority provision in the proposed Agreement, lead the Court to the inescapable conclusion that a strong likelihood exists that an atmosphere of hostility and animosity will arise between the incumbent employees and the incoming victim class. Thus, the Court finds that the adverse impact of the provision transcends those who are at risk; it will pervade these obviously closely-knit departments. Looking to the "practical realities and necessities inescapably involved in reconciling competing interests," the Court finds that this Agreement does not embody the "special blend of what is necessary, what is fair, and what is workable." *Teamsters,* 431 U.S. at 375, 97 S.Ct. at 1875. Therefore, the Court does not approve the proposed settlement agreement.

### CONCLUSION

The Court has carefully considered the issues, and finds that it cannot approve the

---

14. Despite this forecast of interference with vested rights, the Agreement lacks an equitable mechanism to address, on a case-by-case basis, the potential conflicts that will indubitably arise from its implementation, and to thereby protect "the innocent." Should the parties pursue a refinement of the present agreement, inclusion of such a mechanism would help alleviate the concerns of the Court.

proposed settlement agreement at this juncture. First, the Court finds that the Agreement should not be approved against the objections of non-consenting parties. Second, the Court finds that, as to the incumbent employees, the Agreement is not fair. Accordingly, it is

ORDERED AND ADJUDGED that approval of the settlement agreement entered into by the United States and the City of Hialeah is hereby DENIED.

DONE AND ORDERED.