2013 CO 16

**A.M., by and through his Guardian ad Litem; and L.H. and R.H.; Petitioners/Cross–Respondents**

v.

**A.C., Respondent,**

and

**The People of the State of Colorado, in the Interest of Minor Child A.M., Respondent/Cross–Respondent,**

v.

**N.M., Respondent/Cross–Petitioner.**

**Supreme Court Case No. 11SC53**

Supreme Court of Colorado.

February 25, 2013

As Modified on Denial of Rehearing March 18, 2013.

Guardian ad Litem for the Minor Child: James A. Shaner, Cortez, Colorado.

Attorneys for Petitioners/Cross–Respondents L.H. and R.H.: Rocky Mountain Children's Law Center. Jeffrey C. Koy, Denver, Colorado, Law Office of Seth A. Grob, LLC, Timothy J. Eirich, Evergreen, Colorado.

Attorney for Respondent A.C.: Thomas R. Williamson, Durango, Colorado.

Attorney for Respondent/Cross–Respondent: Bob D. Slough, Montezuma County Attorney, Cortez, Colorado.

Attorneys for the Respondent/Cross–Petitioner N.M.: Jon Lewis Kelly, PC, Jon L. Kelly, Dolores, Colorado.

Attorneys for Amicus Curiae Colorado State Foster Parent Association: Arnold & Porter LLP, Matthew Douglas, Jessica Brody, Holly Sterrett, Paul Rodney, Denver, Colorado.

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶1 In this dependency and neglect case, we review a court of appeals opinion affirming the termination of the father's parental rights and reversing the termination of the mother's parental rights on the grounds that the trial court erred by allowing foster parent intervenors to participate fully in the termination hearing. *People in Interest of A.M.*, No. 10CA522, slip op. at 17, ── P.3d ──, ──, 2010 WL 5621076 (Colo.App. Dec. 23, 2010) (selected for official publication). The court of appeals construed section 19-3-507, C.R.S. (2012), of the Children's Code and held that foster parent intervenors possess only a limited right of participation at the termination hearing. The court also held that the parents' due process rights were violated by the full participation of the intervenors in the termination hearing. With respect to the rights of the mother, it held that the full participation of the foster parents violated her constitutional rights warranting reversal. With respect to the father, the court held that the constitutional error was harmless beyond a reasonable doubt. We construe section 19-3-507(5)(a) and hold that foster parents who meet the required statutory criteria to intervene may participate fully in the termination hearing without limitation. We also hold that parents' due process rights are not impacted by the full participation of foster parents in the termination hearing.

¶2 Hence, we reverse the judgment of the court of appeals with respect to mother, remand to that court for consideration of the remaining issue on appeal, and affirm as to the termination of the father's right.

## I. Facts and Procedural History

¶3 A.C. (mother) and N.M. (father), on three occasions in the span of three months, took their infant son, A.M., to the emergency room for treatment of a number of unexplained injuries including a lacerated tongue, a bruised cheek, and a fractured elbow. As a result, the Montezuma County Department of Social Services (the "Department") investigated the nature of the injuries. After x-rays revealed numerous other fractures to A.M.'s ribs, tibia, and cheek bone, the Department filed a petition in dependency and neglect. The court granted the Department temporary custody of A.M., and the Department placed A.M. in foster care with L.H. and R.H. (the foster parents). Based on admissions by the parents, the trial court found A.M. dependent and neglected as to both parents on the specific ground that A.M.' s environment was injurious to his welfare and entered the adjudicatory order. *See* § 19-3-102(1), C.R.S. (2012) ("A child is neglected and dependent if .... [t]he child's environment is injurious to his or her welfare."). The adjudicatory order allowed the court to enter orders regarding the child and his parents. As a result, the trial court ordered the parents to participate in treatment plans intended to help the parents rehabilitate and the family reunify.

¶4 After A.M. had been in the care of the foster parents for approximately fifteen months,[1] they moved to intervene pursuant to section 19-3-507(5)(a). The foster parents claimed to have "specific knowledge about [A.M.] and what was in his best interest." A.C. objected to the intervention, arguing that the foster parents' desire to adopt the child created a conflict of interest, and asked that A.M. be removed from the foster parents' care immediately. The trial court allowed the intervention, finding the foster parents met the statutory criteria in section 19-3-507(5)(a), and denied the request to remove the child from the foster parents' care.

¶5 Three months after the foster parents intervened and eighteen months after the Department removed A.M. from the parents' care, the guardian ad litem filed a motion to terminate the parental rights of A.C. and

---

1. This lengthy placement came about as a result of the parents initially entering into a deferred adjudication pursuant to section 19-3-505, C.R.S. (2012). Under that statute, a court may continue the hearing and delay entering the order adjudicating the child dependent and ne- glected if facts exist to justify the adjudication and all parties consent to the continuance. § 19-3-505. The trial court subsequently revoked the deferred adjudication after the parents failed to comply with their treatment plans.

N.M.[2] The Department supported termination of N.M.'s parental rights but opposed termination of A.C.' s parental rights. The parents both objected to the foster parents' full participation in the termination hearing, citing *People in Interest of A.W.R.*, 17 P.3d 192 (Colo.App.2000), for the proposition that foster parent intervenors are limited to providing information as witnesses at the termination hearing. The trial court overruled the objection and permitted the foster parents to participate fully as party intervenors at the termination hearing. As a result, counsel for the foster parents gave an opening statement, cross-examined witnesses, made evidentiary objections, and gave a closing argument. The foster parents sought termination of the parents' rights as to A.M. At the conclusion of the hearing, the court terminated the parental rights of both A.C. and N.M. as to A.M.

¶ 6 The parents appealed the order terminating their parental rights on the grounds that the trial court erred by permitting the foster parents to intervene and to participate fully in the termination hearing. Again citing to *A.W.R.*, the parents asserted that section 19–3–507(5)(a) only affords foster parents the limited right to provide information about a child in their care at a termination hearing. The court of appeals found that the trial court erred when it allowed the foster parents to participate fully in the termination hearing and reversed as to A.C., the mother, but affirmed as to N.M., the father. *A.M.*, No. 10CA522, slip op. at 44–45, ⸺ P.3d at ⸺ – ⸺.

¶ 7 To analyze whether the foster parents' full participation in the termination hearing constituted error, the court of appeals interpreted the statute authorizing foster parent participation, section 19–3–507(5)(a). *Id.* at 27–28, ⸺ P.3d at ⸺ – ⸺. That court determined the statute was ambiguous. *Id.* at 15–17, ⸺ P.3d at ⸺ – ⸺. It then relied on the court of appeals case, *A.W.R.*, and various canons of statutory construction to hold that subsection (5)(a) restricted the foster parents' participation after being granted the right to intervene. *Id.* at 12–25, ⸺ P.3d at ⸺ – ⸺. The court concluded that foster parents who intervene have no statutory right to participate to the same extent as the other parties at a termination hearing, and because the trial court's order permitted the foster parents to participate fully, the parents' constitutional right to due process was violated. *See id.* at 27–28, 38–41, ⸺ P.3d at ⸺ – ⸺, ⸺ – ⸺. The court of appeals then attempted to resolve whether the error affected the order terminating the parents' rights as to their child. *See id.* at 41–45, ⸺ P.3d at ⸺ – ⸺. Applying a constitutional harmless error analysis to the trial court's decision to allow the foster parents to participate fully, the court held that the advocacy by the foster parents "substantially influence[d]" the trial court's decision to terminate the mother's parental rights by "unduly emphasiz[ing] the testimony of the [guardian ad litem]'s witnesses" and by "unduly cast[ing] doubt on the credibility of the witnesses presented by [the Department] and mother." *Id.* at 44–45, ⸺ P.3d at ⸺ – ⸺. Thus, the court of appeals concluded that such error was not harmless beyond a reasonable doubt and reversed the trial court's order terminating A.C.' s parental rights. *Id.* at 45, ⸺ P.3d at ⸺. With respect to N.M.'s rights, the court of appeals concluded that the intervention, although an error of constitutional magnitude, was harmless beyond a reasonable doubt due to the "strong" evidence supporting termination and affirmed the termination of his parental rights. *Id.* at 44, ⸺ P.3d at ⸺. We granted certiorari and now reverse the reinstatement of the mother's parental rights and affirm the termination of the father's rights.[3]

---

**2.** The guardian ad litem is an attorney appointed by the trial court who is charged with representing the child's best interests. § 19–3–602(3), C.R.S. (2012). The guardian ad litem is authorized to file a motion to terminate parental rights. *People in Interest of M.N.*, 950 P.2d 674, 676 (Colo.App.1997).

**3.** We granted certiorari to consider,

**1.** Whether the court of appeals erred when it determined that the intervenor's cross-examination of witnesses concerning the "care and protection" of the child during a termination of parental rights hearing exceeded the meaning of "intervention," pursuant to section 19–3–507(5)(a), C.R.S.

## II. Standard of Review

¶ 8 We review de novo the court of appeals' construction of a statute. *Boulder Cnty. Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo.2011). Our primary task in construing statutes is to ascertain and give effect to the intent of the General Assembly. *In re B.B.O.*, 2012 CO 40, ¶ 6, 277 P.3d 818, 820. We first look to the language of the statute, giving effect to the plain and ordinary meaning of words and phrases selected by the General Assembly. *Ceja v. Lemire*, 154 P.3d 1064, 1066 (Colo. 2007). If statutory language is unambiguous, we apply it as written without resorting to other rules of statutory construction. *Holcomb v. Jan – Pro Cleaning Sys. of S. Colo.*, 172 P.3d 888, 890 (Colo.2007). Statutory language is ambiguous when it is susceptible to multiple valid interpretations. *State v. Nieto*, 993 P.2d 493, 500–01 (Colo.2000). We favor interpretations that produce a harmonious reading of the statutory scheme and eschew constructions that create inconsistency. *People v. Dist. Ct.*, 713 P.2d 918, 921 (Colo.1986). Only if the statute is susceptible to multiple competing interpretations may we then resort to "the statute's legislative history, the state of the law prior to the legislative enactment, the problem addressed by the legislation, and the statutory remedy created to cure the problem." *See Rowe v. People*, 856 P.2d 486, 489 (Colo.1993).

## III. Analysis

¶ 9 We begin by reviewing the statutory procedures surrounding an action in dependency and neglect as set forth in the Children's Code. Next, we construe the plain language of section 19–3–507(5)(a). Then, we clarify the meaning of the prior case law interpreting that section. Finally, we consider the argument that allowing foster parent intervenors to participate fully in the termination of parental rights hearing violates parents' due process rights.

(2009), and violated the parents' right to due process.
2. Whether the court of appeals correctly selected and applied a harmless error beyond a reasonable doubt standard to review the statutory and constitutional violations that resulted from the full par-

## A. The Children's Code

¶ 10 To place this appeal in context, we start with a brief review of the statutory procedures in a dependency and neglect proceeding. Title 19, the Children's Code, addresses issues pertinent to children in Colorado who are involved in delinquency, dependency and neglect, parentage, or relinquishment and adoption. The overriding purpose of the Children's Code is to protect the welfare and safety of children in Colorado by providing procedures through which their best interests can be ascertained and served. *See L.G. v. People*, 890 P.2d 647, 654 (Colo.1995). Article three, title 19, is the statutory framework for dependency and neglect proceedings.

¶ 11 A dependency and neglect proceeding commences when a local county department of human services or a local law enforcement agency is made aware of suspected child abuse or neglect. The local department of human services, after taking immediate steps to protect the child or children, must give notice to a juvenile court of competent jurisdiction with respect to the child. § 19–3–312(1), C.R.S. (2012). Upon receiving notice of the alleged abuse or neglect, the juvenile court may authorize the filing of a petition in dependency and neglect. *Id.*

¶ 12 A petition in dependency and neglect is filed by the People of the State of Colorado. § 19–3–502, C.R.S. (2012). The State is the exclusive party entitled to bring an action in dependency and neglect. *McCall v. Dist. Ct.*, 651 P.2d 392, 394 (Colo. 1982). The court must notify and advise the parents in open court that, as respondents to the petition, they are entitled to certain rights. § 19–3–503, C.R.S. (2012). The court informs the parents of their right to counsel, their right to contest the allegations made in the petition, and their right to request trial by jury or by the court.[4] § 19–3–202, C.R.S.

ticipation of the foster parents in the termination of the parental rights trial.

4. The State, the guardian ad litem, or any respondent may demand trial by a jury of six persons. § 19–3–202, C.R.S. (2012).

(2012). In either trial by jury or by the court, the State must prove the allegations contained within the petition by a preponderance of the evidence. *People in Interest of A.M.D.*, 648 P.2d 625, 641 (Colo.1982). If the State fails to carry its burden, then the court will dismiss the case and vacate all orders with respect to the child. § 19–3–505(6). On the other hand, if the State proves the allegations of abuse or neglect by a preponderance of the evidence, the court will sustain the petition. § 19–3–505(7). At that point, the court may adjudicate the child to be dependent and neglected. *Id.* The adjudication represents the court's determination that state intervention is necessary to protect the child and that the family requires rehabilitative services in order to safely parent the child. *A.M.D.*, 648 P.2d at 640. Rather than immediately determining whether the child is dependent and neglected, the court may, upon consent of all parties, enter a deferred adjudication by continuing this determination for up to six months. § 19–3–505(5)(a)–(b). Although the court may continue the determination for an additional six months, the court must either sustain or dismiss the petition within one year. *See* § 19–3–505(5)(b).

¶ 13 If the court sustains the petition and adjudicates the child dependent and neglected, then it will convene a dispositional hearing. § 19–3–508, C.R.S. (2012). The court must hold the dispositional hearing within thirty days of the adjudication if the child is under six years of age, or forty-five days if the child is over six years of age. *Id.* At the dispositional hearing, the court must order a treatment plan. § 19–3–507.

¶ 14 The purpose of the treatment plan is to provide services to the family, to prevent unnecessary out-of-home placement of the child, and to facilitate reunification of the child and family.[5] § 19–3–507(1)(b). After the court orders the treatment plan, it sets periodic reviews to monitor the family's progress and maintains jurisdiction in order to assist the family in complying with the treatment plan. Failure to comply reasonably with the treatment plan may provide grounds

for the State or the guardian ad litem to file a motion to terminate parental rights. § 19–3–604(1)(c), C.R.S (2012); *People in Interest of M.N.*, 950 P.2d 674, 676 (Colo.App.1997). Conversely, if the family completes the treatment plan and the court is satisfied the family is no longer in need of services and the children are safe, then the court will dismiss the case. *See* § 19–3–604. Upon dismissal, the State is no longer involved with the family. At all times, the best interest of the child or children is paramount. *See* § 19–1–102, C.R.S. (2012); *L.G.*, 890 P.2d at 654.

## B. The Statutory Authority for Foster Parent Participation

¶ 15 With this procedural framework in mind, we now turn to the statutory authority for foster parents to participate in this process. Part five of article three of the Children's Code, § 19–3–500.2, et seq., C.R.S. (2012), governs, among other things, the mechanism for adjudicating a child dependent and neglected and the procedures following adjudication. Section 19–3–507 is titled "Dispositional Hearing" and governs proceedings immediately following the adjudication of a minor as dependent and neglected. The subsection in dispute is 19–3–507(5)(a), which provides for intervention by certain individuals who, (1) have the child in their care for more than three months; and (2) have knowledge or information concerning the care and protection of the child:

> Parents, grandparents, relatives, or foster parents who have the child in their care for more than three months who have information or knowledge concerning the care and protection of the child may intervene as a matter of right following adjudication with or without counsel.

Whether foster parents may intervene turns on the length of time the child has been in their care and their abilities to inform the court about the "care and protection of the child." The statute defines the criteria for intervention. It is silent as to the extent of foster parents' rights upon intervention.

---

5. The treatment plan may provide a wide range of services depending on the needs of the child and the parents. For example, the services may include, *inter alia*, mental health services, sub- stance abuse treatment, parenting classes, or vocational training. The treatment plan is designed individually for each family.

¶ 16 To determine the foster parents' rights upon intervention, we first parse the meaning of the statutory words provided by the legislature. The statute provides that qualified foster parents may *"intervene* as a matter of right following adjudication." 19-3-507(5)(a) (emphasis added). We thus consider the plain meaning of "intervene." "Intervention is a procedural device whereby an outsider or stranger to litigation may enter the case *as a party* for the purpose of presenting a claim or defense." *People v. Ham,* 734 P.2d 623, 625 (Colo.1987) (emphasis added). Intervention means (1) "[t]he entry into a lawsuit by a third party who, despite not being named a party to the action, has a personal stake in the outcome" or (2) "[t]he legal procedure by which such a third party is allowed to become a party to the litigation." *Black's Law Dictionary* 897 (9th ed. 2009). Hence, to "intervene" means to become a party to the litigation. *See also Allison v. People,* 132 Colo. 156, 164, 286 P.2d 1102, 1106 (1955) ("They were permitted to intervene in the action. Thus they became parties to the record.").

¶ 17 We next turn to the question of whether intervention by a foster parent entitles the foster parent to the full panoply of rights that the existing parties enjoy. The designation "intervenor" signifies how a party came to be involved in a case. By itself, the term does not restrict participation. Generally, courts grant intervenors the same rights as all other parties. *See, e.g., United States v. City of Hialeah,* 899 F.Supp. 603, 611 (S.D.Fla.1994), *aff'd,* 140 F.3d 968 (11th Cir.1998); *In re Oceana Int'l, Inc.,* 49 F.R.D. 329, 333 (S.D.N.Y.1969); *Hartley Pen Co. v. Lindy Pen Co.,* 16 F.R.D. 141, 153 (S.D.Cal.1954); *see also Roosevelt v. Beau Monde Co.,* 152 Colo. 567, 577, 384 P.2d 96, 101 (1963) (holding that Colorado's intervention rule, C.R.C.P. 24, is identical to the corresponding federal rule). As to this specific statute, subsection (5)(a) does not contain any explicit limit to the rights of intervenors, nor does it limit the substance of intervenor participation. Subsection (5)(a) contains no temporal limits on intervenor participation other than the requirement that intervention occur after adjudication has occurred. The legislature could have restricted the timing, duration, and substance of foster parents' intervention, but it did not. *See Turbyne v. People,* 151 P.3d 563, 567 (Colo.2007) ("When construing a statute, .... [w]e do not add words to the statute or subtract words from it."); *see also Dean v. United States,* 556 U.S. 568, 572, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." (internal quotation marks omitted)).

¶ 18 Although the statute, by its words, does not limit the right to intervene, the parents argue that placement within the section entitled "Dispositional Hearing" supports a reading of subsection (5)(a) as a temporal restriction on the full participation of foster parents to the dispositional hearing. The General Assembly uses section headings "only for the purpose of convenience, orderly arrangement, and information." § 2-5-113(4), C.R.S. (2012). It has instructed that "no implication or presumption of a legislative construction is to be drawn therefrom." *Id.* Accordingly, subsection (5)(a)'s placement in the "Dispositional Hearing" section does not compel us to adopt the parents' construction.

¶ 19 More significantly, the parents' construction of subsection (5)(a) creates an untenable result in expedited placement proceedings. Children under six years of age are subject to expedited placement procedures, which are intended to swiftly place the youngest—and thereby most vulnerable—children in permanent homes. *See* § 19-1-102(1.6). To intervene, however, foster parents must have had the child in their care for over ninety days. § 19-3-507(5)(a). In expedited placement cases, while technically possible, it is impracticable that a dispositional hearing would be held more than ninety days after a child under six is placed in foster care.[6] Thus, where the child is under six,

---

**6.** The time frame presented by the Children's Code is extremely unyielding in this regard. A petition alleging dependency and neglect must be filed with the court within fourteen days of the department of social services taking a child into custody. C.R.J.P. 4. Upon filing of the petition, the court must "promptly" serve summons of the petition upon the respondents. § 19-3-503(1).

holding the dispositional hearing within the statutorily required time frame will result in the hearing's conclusion prior to the ripening of foster parents' intervention right. If full participation is limited to the dispositional hearing, most foster parents will—in cases involving a young child—never enjoy full party status. Such a result is absurd and untenable. *See Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1190 (Colo.2010). The General Assembly, having granted foster parents the ability to advocate for the child's best interests as intervenors, did not, in the same breath, confine that ability to a hearing in which there is no practical likelihood that foster parents would be able to participate.

¶ 20 As a result, and because of our declination to read words into a statute that do not appear on its face, we conclude that the timing and scope of foster parent intervenors' participation is derived from the absence of words of limitation in section 19–3–507(5)(a). Foster parent intervenors are afforded the same degree of participation as all other parties, and such participation is not limited to the dispositional hearing. Foster parents who meet the required statutory criteria to intervene may participate fully in the termination hearing without limitation.

### C.  *People in Interest of A.W.R.*

¶ 21 Despite the statute's plain language, the parents and the Department argue that foster parent participation in the termination hearing is limited by prior case law interpreting section 19–3–507(5)(a), *People in Interest of A.W.R.,* 17 P.3d 192 (Colo.App.2000). In our view, the meaning of this case has been the subject of substantial confusion. Accordingly, we briefly review *A.W.R.*

¶ 22 In *A.W.R.,* the court of appeals considered whether a foster parent was entitled to participate fully in a permanency planning hearing when, at the time of the hearing, the child had been removed from her care and returned to the mother. 17 P.3d at 195–97. That court affirmed the trial court's decision to restrict the participation of the foster parent to giving direct testimony. *Id.*

¶ 23 In so holding, the *A.W.R.* court distinguished a prior decision by the court of appeals, *People in Interest of C.P.,* 34 Colo.App. 54, 524 P.2d 316 (1974), which held that a grandparent intervenor may participate fully in a dependency and neglect proceeding. *Id.* at 197. The *A.W.R.* court noted that in *C.P.* the child remained in the grandparent intervenor's care. *Id.* Because the foster mother in *A.W.R.* no longer had custody of the child, the *A.W.R.* court concluded that her rights upon intervention were not dictated by *C.P. Id.* Thus, the *A.W.R.* court did not follow *C.P.* because of the child's placement at the time of the hearing, and the court therefore limited the foster mother's participation.[7] *See id.*

¶ 24 In the instant case, the parents and the Department rely on *A.W.R.* for the proposition that intervenors who are foster parents have limited participation regardless of whether the child remains in their care. Contrary to this reading, the court of appeals in *A.W.R.* did not break from its precedent in *C.P.* on the basis of the intervenor's identity as a foster parent. Rather, the *A.W.R.* court distinguished *C.P.* by holding that an intervenor's rights are contingent on the intervenor retaining custody of the child.

---

The adjudicatory hearing must occur at the earliest time possible, but "in no instance" later than sixty days from service of the petition where the child is under six years of age, § 19–3–505(3), and, in the case of such a child, the dispositional hearing must be held within thirty days of adjudication, § 19–3–505(3), (7)(b); § 19–3–508(1). Delay is permissible only if the court finds it is in the best interest of the child. § 19–3–505(3). Accordingly, if a child under six were immediately placed into the uninterrupted care of a foster parent, every statutory guideline were delayed to its longest limit, and the motion to intervene was filed the moment the child had been in foster care for over ninety days, a court would still only

have fourteen days plus the time it took to serve respondents to await any response or reply to the motion to intervene, to consider the motion's merits, and to rule if it is to do so before the dispositional hearing.

7.  The remainder of the *A.W.R.* court's rationale for restricting participation concerned whether the foster mother's interest in continuing a relationship with the child gave rise to a constitutional right to intervene and participate fully—an issue not presented by this appeal. *See* 17 P.3d at 195–97.

¶ 25 Moreover, the limited right granted to the foster mother in *A.W.R.*—the right merely to provide information—is already granted to foster parents by virtue of section 19–3–502(7). That statute permits foster parents who have not intervened to participate as witnesses or observers:

> In addition to notice to all parties, the court shall ensure that notice is provided of all hearings and reviews held regarding a child to the following persons with whom a child is placed: *Foster parents*, pre-adoptive parents, or relatives. Such persons *shall have the right to be heard at such hearings and reviews.* ... The foster parent, pre-adoptive parent, or relative providing care to a child shall not be made a party to the action for purposes of any hearings or reviews solely on the basis of such notice and right to be heard.

§ 19–3–502(7) (emphasis added). Thus, the *A.W.R.* court did not grant any substantive right to the foster mother not already provided by section 19–3–502(7). Put another way, the *A.W.R.* court refused to grant the foster mother the full participation rights normally associated with intervention because the child was not in the foster parent's care at the time of the hearing. The practical effect is therefore the same as if the court had decided that the foster mother did not "have the child in [her] care for more than three months" and denied the foster mother's motion to intervene because it failed to meet the statutory criteria. *See* § 19–3–507(5)(a) (providing that intervention is permissible only after child has been placed in care of foster parents for more than three months). Accordingly, *A.W.R.* did not impose a new limitation on the rights of intervenors, but instead, merely applied the three-month placement requirement in section 19–3–507(5)(a) to a situation where a child's placement with a foster parent had expired.[8]

¶ 26 Our reading of *A.W.R.* highlights another concern expressed by the court of appeals in this case: that to allow foster parents to intervene will bog down the termination hearing and frustrate the ultimate purpose of serving the best interests of the child. *See A.M.*, No. 10CA522, slip op. at 40 n. 4, —— P.3d at —— n. 4. Foster parent participation, however, is not without limits. These limits go beyond the requirements to intervene found in section 19–3–507. Indeed, the presentation of evidence by any party is limited by familiar principles of evidence. The prohibition on irrelevant or needlessly cumulative evidence should ameliorate the potentially significant increase in the volume of information at the termination hearing. *See* C.R.E. 401, 403. Juvenile courts act as gatekeepers so that, in cases where additional parties have intervened, the termination hearing ought not become awash with unnecessary evidence or devolve into a contested custody hearing.

### D. Due Process

¶ 27 Citing this same concern over the subversion of the termination hearing, the parents, joined by the Department, argue that allowing foster parents the same rights as all other parties in a termination hearing violates parents' procedural protections under the Due Process Clause. They contend that the fairness of the termination hearing is constitutionally compromised by allowing foster parents to participate without limitation. They argue that due process requires that the court limit foster parents' participation at a termination hearing to that of a witness. The foster parents counter that due process is satisfied because, prior to terminating their parental rights, the trial court afforded the parents notice and a hearing.

¶ 28 This substantial disagreement illustrates a maxim of due process: "due process is flexible and calls for such proce-

---

8. We decline to comment on the correctness of *A.W.R.*'s holding. That issue would turn on whether the language in section 19–3–507(5)(a), describing permissible intervenors as "hav[ing] the child in their care for more than three months," includes individuals who no longer have the child in their care at the time of the hearing. Because it is not before us, we express no opinion as to whether subsection (5)(a) restricts intervention to those parties who, currently or within any specific time frame, have had the child in their care for longer than three months.

dural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Due process is ultimately rooted in the concept of fundamental fairness, "a requirement whose meaning can be as opaque as its importance is lofty." *Lassiter v. Dept. of Social Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (internal quotation marks omitted). "Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation...." *Id.* at 24–25, 101 S.Ct. 2153. Because the specific comports of fundamental fairness are situational by nature, foster parent participation in the termination hearing must be viewed in context of all protections afforded to parents at that hearing. Accordingly, to bring context to the parents' argument, we summarize the significant protections Colorado law already provides to parents facing termination of the parent-child relationship.

¶ 29 The criteria for termination must be proven by clear and convincing evidence. § 19–3–604(1)(a). Parents are entitled to notice of the allegations supporting the motion to terminate, to have a hearing on the motion, and, at that hearing, to be assisted by legal counsel. § 19–3–602, C.R.S. (2012); *People in Interest of V.M.R.*, 768 P.2d 1268, 1270 (Colo.App.1989). If indigent, parents may request counsel at the expense of the State and may employ the services of an expert witness at the state's expense. § 19–3–607, C.R.S. (2012); *Lassiter*, 452 U.S. at 24, 101 S.Ct. 2153 . At the termination hearing, the parents have the right to cross-examine adverse parties and call their own witnesses. *See People in Interest of J.E.B.*, 854 P.2d 1372, 1375 (Colo.App.1993). Before terminating the parent-child relationship, the trial court must consider and eliminate less drastic alternatives, *see People in Interest of M.M.*, 726 P.2d 1108, 1122–23 (Colo.1986), and the parents must be given the opportunity to rehabilitate through participation in the treatment plan, *see* § 19–3–604. Finally, termination is impossible absent the preliminary determination that the child is dependent and neglected, and adjudication is contingent

on strict adherence to numerous procedural safeguards. *See supra* Part III.A.

¶ 30 The parents have cited no authority, nor are we aware of any, in support of the notion that these procedures fail to guarantee parents fair treatment at the termination hearing. They have failed to produce any direct authority that foster parent participation will undermine these protections. Instead, the parents cite two cases, *Lassiter*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, and *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), that analyzed due process rights available to parties at state juvenile proceedings under the three-factor framework in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). They argue that *Eldridge* dictates that the procedural protections of the Due Process Clause prohibit full foster parent participation in the termination hearing.

¶ 31 *Eldridge* provides that the "specific dictates of due process" can be understood by consideration of three factors: (1) the private interests at stake; (2) the risk of the erroneous deprivation of that interest and the probability that the procedural safeguards that have been proposed will mitigate that risk; and (3) the government's interest, including the "fiscal and administrative burdens" of implementing the proposed procedure. 424 U.S. at 335, 96 S.Ct. 893. Accordingly, the parents urge us to restrict foster parent participation in the termination hearing because (1) their interest in maintaining the parent-child relationship is paramount; (2) the cumulative effect of allowing foster parents and other intervenors to advocate alongside the guardian ad litem poses a substantial risk of erroneous terminations; and (3) the government's interest in terminating their parental rights is minimal.

¶ 32 Previously, we held that the three-factor analysis in *Eldridge* was an appropriate tool to assess the question of "what process is due" parties facing termination of parental rights. *People in Interest of A.M.D.*, 648 P.2d 625, 635 (Colo.1982); *see also Lassiter*, 452 U.S. at 24–25, 101 S.Ct. 2153 (in juvenile cases due process must be analyzed "by first considering any relevant precedents and then by assessing the several

interests that are at stake"). In *A.M.D.*, we employed the *Eldridge* balancing test to determine whether the Due Process Clause mandated a stricter standard of proof at the adjudicatory and termination hearings. *A.M.D.*, 648 P.2d at 637. There, we determined that the private interests of the parents in preserving their rights were "commanding." *Id.* at 636–37. We discussed that the risk of error at stake was the "risk of erroneous fact finding." *Id.* at 637. The government's interests, we held, included the *parens patriae* interest in preserving and promoting the well-being of the child and the interest in reducing the fiscal and administrative burdens that come with a higher burden of proof. *Id.* at 637 (quoting *Santosky*, 455 U.S. at 765, 102 S.Ct. 1388 ). We also discussed, however, that a higher burden of proof at the adjudicatory stage could highlight the adversarial nature of the process, replacing the State's role as a "helping intervenor" with that of an "adversary of the parents, bent on the permanent destruction of their relationship with the child." *Id.* at 640. For these reasons, we concluded that the government's "substantial" interests went beyond its pecuniary stake. *Id.* Balancing those interests against one another in the context of each hearing, we concluded that fairness required a clear and convincing standard at the termination hearing but only a preponderance of the evidence standard at the adjudicatory hearing. *Id.* at 641.

¶ 33 Like *A.M.D.*, the cases cited by the parents demonstrate how the *Eldridge* factors apply in the context of a juvenile proceeding. In *Santosky*, the United States Supreme Court employed the *Eldridge* factors to evaluate whether due process required elevating the standard of proof at juvenile hearings. 455 U.S. at 747, 102 S.Ct. 1388. In *Lassiter*, the Court used the *Eldridge* factors to conclude that parents facing termination have the right to court-appointed counsel. 452 U.S. at 24, 101 S.Ct. 2153. As to the first *Eldridge* factor, *Santosky* and *Lassiter* both emphasized the significant private interests at stake when the State seeks to forever cut off the parent-child relationship. *Santosky*, 455 U.S. at 758–59, 102 S.Ct. 1388; *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153. As to the second *Eldridge* factor,

the Court in *Santosky* expressed its concern over the risk of erroneous fact finding at a juvenile hearing, 455 U.S. at 764, 102 S.Ct. 1388 , and the Court in *Lassiter* commented on the attempts by the North Carolina legislature to "assure accurate decisions" short of providing counsel for indigent parents, 452 U.S. at 28, 101 S.Ct. 2153. Finally, in considering the third *Eldridge* factor, both decisions emphasized that the government's interest at a termination hearing is more than simply the cost. *See Santosky*, 455 U.S. at 766, 102 S.Ct. 1388 ; *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153 . As stated in *Lassiter*, "[s]ince the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision." 452 U.S. at 27, 101 S.Ct. 2153. Hence, these cases are in accord with our understanding of how the *Eldridge* factors answer "what process is due" at juvenile hearings.

¶ 34 Applying the *Eldridge* factors to the current case, we agree with the parents that their private interest in the continuation of the parent-child relationship is commanding. We now determine, as we did in *A.M.D.*, that when considered alone the first *Eldridge* factor weighs heavily in the parents' favor.

¶ 35 Turning to the second *Eldridge* factor, we consider whether limiting foster parent participation will decrease the risk of an erroneous decision. By restricting the role of foster parents to that of a witness, the limitation the parents urge would restrict both the evidence foster parents may present and their method of presenting evidence. The Children's Code, however, contains many indications that foster parents often have valuable information about their foster children. For example, section 19–3–502(7) provides foster parents with the right to be heard at all hearings and reviews; section 19–3–702(1.5), C.R.S. (2012), provides that all permanency planning hearings must be open to foster parents if appropriate; and section 19–3–604(1)(c)(I)(B), provides that courts may take testimony from foster parents at the termination hearing regarding the parents' progress under their treatment plan. *See also People in Interest of M.D.C.M.*, 34 Colo.App. 91, 94, 522 P.2d 1234, 1236 (1974). Indeed, as the immediate caregivers for the

child, foster parents are often uniquely positioned to provide a juvenile court with the most up-to-date status of the child and the child's well-being. Unlike the stricter standard of proof at issue in *A.M.D.*, the limitation proposed by the parents would actually serve to diminish the accuracy of decisions by withholding admissible, highly relevant information from a juvenile court's consideration merely because it comes from a foster parent. Exclusion of relevant information that foster parent intervenors might provide would therefore heighten, not mitigate, the risk of an erroneous decision at the termination hearing.[9]

¶ 36 Turning to the third *Eldridge* factor, the General Assembly has declared that "the safety and protection of children" is a matter "of statewide concern." § 19–3–100.5(1), C.R.S. (2012). The State, as *parens patriae*, has a "strong interest in promoting the welfare of children within its borders." *E.P. v. Dist. Ct. of Garfield Cnty.*, 696 P.2d 254, 259 (Colo.1985). Not only does the State have a strong interest in promoting the welfare of children, but it also has a significant interest in ensuring that termination proceedings are "accurate and just." *Lassiter*, 452 U.S. at 27, 101 S.Ct. 2153 . We have urged courts to exercise extreme caution when considering the termination of parental rights. *People in Interest of E.A.*, 638 P.2d 278, 285 (Colo.1981). That caution is best exercised by giving due consideration to all relevant, non-cumulative evidence—whatever the source. Because of its role in securing both the child's welfare and a just outcome at the juvenile proceeding, the government's interests are substantial.

¶ 37 On balance, while the parents' interest to maintain the parent-child relationship is significant, the limitation they suggest would increase the risk of an erroneous decision at the termination hearing, and the government's interest to maintain a fair proceeding and protect the long-term welfare of children is substantial. Hence, we conclude that the *Eldridge* factors do not support the position that due process requires limits on foster parent participation at the termination hearing.

¶ 38 Because the core concern of due process is fundamental fairness, all the procedures employed at the termination hearing must be examined to determine whether they comport with due process. In the context of the protections offered by the Children's Code, our precedent, and the precedent of the United States Supreme Court, we conclude that full participation by foster parent intervenors does not undermine the fundamental fairness of the termination hearing. Accordingly, we hold that parents' due process rights are not impacted by the full participation of foster parents in the termination hearing.

## IV. Application

¶ 39 We now turn to the intervention and participation by the foster parents, L.H. and R.H., in the termination hearing in this case. It was undisputed that A.M. was in the care of the L.H. and R.H. for greater than three months and that the foster parents claimed to have knowledge and information "concerning the care and protection of the child." Under section 19–3–507(5)(a), no further findings were required to trigger their right to intervene after adjudication. The trial court correctly allowed the foster parents to intervene and did not err in affording the foster parents full party status at the termination hearing. As intervenors, the foster parents were properly permitted to make opening statements, cross-examine wit-

---

9. The parents attempt to downplay the deleterious effects that exclusion of relevant evidence would have on the termination hearing by arguing that the trial court will be unduly influenced if the parties advocating for termination so vastly outnumber those advocating against. The parties cite no authority to support their contention, and we have rejected an analogous argument in the past. *See Medina v. People*, 114 P.3d 845, 856 (Colo.2005) (allowing twelve-member jury to ask questions in criminal trial not a violation of due process); *see also People in Interest of A.J.L.*, 243 P.3d 244, 252 (Colo.2010) ("[A]ppellate courts should acknowledge the trial judge's unique opportunity to be present at trial and the advantage this affords the trial court in determining witness credibility and the weight, sufficiency, and probative value of evidence."). We can discern no possible threat to the reliability of the termination hearing merely as a result of increasing the number of parties.

nesses, introduce evidence, make evidentiary objections, and give closing argument. Because there was no error, we affirm the trial court's decision to terminate the parental rights of A.C. and N.M.[10]

### V. Conclusion

¶ 40 We hold that foster parents who meet the required statutory criteria to intervene may participate fully in the termination hearing without limitation. In addition, we hold that parents' due process rights are not impacted by the full participation of foster parents in the termination hearing. We therefore reverse the judgment of the court of appeals with respect to A.C., the mother, and remand to that court for consideration of the remaining issue on appeal. We affirm the court of appeals with respect to the termination of the parental rights of N.M., the father, and remand the case to that court with directions to return it to the trial court for proceedings consistent with this opinion.

10. Because the trial court did not err in allowing full participation of the foster parent intervenors, we do not reach the issue presented by N.M. as to whether the constitutional harmless error standard should apply.