24CA0132 Peo in Interest of JGG 11-14-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0132
El Paso County District Court No. 21JV801
Honorable Jessica L. Curtis, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.G.G., a Child,

and Concerning M.G.,

Appellant.

---

JUDGEMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Kenneth R. Hodges, County Attorney, Amy C. Fitch, Assistant County Attorney, Melanie E. Gavisk, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado, for Appellant

¶ 1    M.G. (father) appeals the judgment terminating the parent-child legal relationship with his child, J.G.G.  We affirm.

## I.    Background

¶ 2    In 2019, the El Paso County Department of Human Services (Department) removed the newborn child from mother's care and placed her with M.C. and L.C. (foster parents).  The Department then filed a petition in dependency and neglect.  Father did not appear in the case for about a year, and the child remained in the care of the foster parents.  In October 2021, the juvenile court allocated parental responsibilities to father and closed the case.

¶ 3    About three weeks later, law enforcement officers responded to father's home and discovered the child — who was two years old at the time — inside the home unsupervised.  Among other things, the officers reported that the home's windows had been left open, drug paraphernalia and marijuana were within the child's reach, and there was an open pocketknife on the floor near the child.  The Department removed the child from father's care and returned her to the foster parents.  The Department filed another petition in dependency and neglect.  After father admitted the allegations, the

1

juvenile court adjudicated the child dependent and neglected and adopted a treatment plan for father.

¶ 4     Father asked the Department to investigate paternal great-uncle and great-aunt (collectively, paternal relatives), who lived in Texas, for placement. The Department eventually completed an Interstate Compact on the Placement of Children (ICPC) home study request with Texas, and a department in Texas approved paternal relatives for placement. Nevertheless, the juvenile court decided to maintain the child's placement with the foster parents and ordered the Department to provide the paternal relatives with family time and family therapy to facilitate a possible transition to the paternal relatives' home. Although the paternal relatives participated in family time and family therapy, the court never changed placement to them.

¶ 5     In May 2023, the Department moved to terminate father's parental rights. The juvenile court held an evidentiary hearing over three days in August, November, and December 2023. Shortly after the first hearing date, the paternal relatives moved to intervene in the case and for a change of placement, under section 19-3-702, C.R.S. 2024. The court then heard evidence related to both the

motion to terminate and the motion for change of placement at the same time for the remainder of the hearing. After hearing the evidence, the court denied the paternal relatives' request to change placement and granted the Department's motion to terminate father's parental rights.

## II.    Reasonable Efforts

¶ 6    Father asserts that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him and reunify him with the child. We disagree.

### A.    Applicable Law and Standard of Review

¶ 7    In deciding whether to terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the parent with the child. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. The Colorado Children's Code defines "reasonable efforts" as the "exercise of diligence and care" to reunify parents with their children and states that the standard is satisfied if the department provides services in accordance with section 19-3-208. § 19-1-103(114). In turn, section 19-3-208 requires departments to

provide screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time; and placement services. § 19-3-208(2)(b).

¶ 8　　In assessing the department's reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  But the parent is ultimately responsible for using the services to comply with the plan, *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011), and the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts, *see People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 9　　Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and

4

law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error and review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation[1]. *Id.*

## B. Analysis

¶ 10 The record supports the juvenile court's finding that the Department made reasonable efforts to rehabilitate father and reunite him with the child. Father's treatment plan required, among other things, that he participate in family time, mental health treatment, and substance abuse treatment. The record shows that the Department provided father with the necessary services to comply with these objectives, including supervised family time services and evaluations for substance abuse and mental health. The caseworker testified that father stopped participating in family time in March 2023 and never completed any evaluations.

---

[1] We need not address whether there is a divisional split on the standard of review for reasonable efforts because under either standard, we reach the same conclusion. *See People in Interest of E.S.*, 2021 COA 79, ¶ 17.

¶ 11    Therefore, the record indicates that the Department provided father with the necessary services to complete his treatment plan, but he did not participate in those services to become a fit parent and reunite with the child.  *See A.V.*, ¶ 12; *S.N-V.*, 300 P.3d at 915. Consequently, we decline to disturb the juvenile court's determination.

¶ 12    On appeal, father does not assert that the Department failed to provide any of the services listed above or any other services listed in section 19-3-208 that were necessary for him to comply with his treatment plan and become a fit parent.  Rather, father contends that the Department did not make reasonable efforts to place the child with the paternal relatives.  Yet, for the purposes of a termination proceeding, the Department does not have a duty to investigate relatives to satisfy its reasonable efforts obligation because "those aren't services aimed at rehabilitating father." *People in Interest of B.H.*, 2021 CO 39, ¶ 79 (noting that section 19-3-604(2)(h) "doesn't ask the trial court to assess whether the

Department mailed family finding letters or explored enough placement options").[2]

¶ 13    However, even assuming, without deciding, that the Department needed to investigate relatives to satisfy its reasonable efforts obligation, we still discern no reversible error.

¶ 14    The record shows that father provided the Department with contact information for the paternal relatives in November 2021, but the Department did not initiate the ICPC home study request until April 2022.  The caseworker explained that the delay in sending the ICPC request resulted, at least in part, from miscommunication between the intake and ongoing caseworkers. Nevertheless, the Department later conceded that it had not made reasonable efforts to initiate the ICPC,  agreed to set up reintegration therapy, and stipulated that it would not file for termination for at least three months after therapy had begun.

---

[2] We note that section 19-3-403(VI), C.R.S. 2024 (effective August 7, 2023) now requires the Department to "exercise due diligence to contact and engage" relatives who respond to the department's notice of placement possibilities; authorizes the court to conduct a review of the Department's due diligence upon request by a relative or party to the proceedings; and authorizes the court to order the Department to take additional measures to engage the relatives. *See also* Ch. 367, sec. 2, § 19-3-403, 2023 Colo. Sess. Laws 67.

¶ 15    After Texas approved the ICPC, the Department began efforts to set up reintegration therapy and establish contact between the paternal relatives and the child. The caseworker testified that the Department did not receive the necessary releases from the paternal relatives until September 2022 and then the service provider had problems reaching the paternal relatives. However, by December 2022, reintegration therapy had not been set up, in large part, because the child's therapist resisted moving forward. As a result, the juvenile court ordered that visits and family therapy begin as soon as possible, and the Department agreed to provide the child with a different therapist. The family therapist said that he did nine telehealth sessions and six in-person sessions with the family. The caseworker testified that the Department also paid for the paternal relatives to travel to Colorado five separate times, and they had about five visits per trip, which accounted for at least twenty-five visits with the child since June 2023.

¶ 16    Nevertheless, the professionals involved in the case did not recommend that the child be placed with the paternal relatives, citing concerns that another disruption in the child's young life could be detrimental to her ability to form healthy attachments.

8

The juvenile court relied primarily on this evidence when deciding to decline placement with the paternal relatives. The court also acknowledged that the "delays" in setting up services for the paternal relatives were "unfortunate," but it concluded that the evidence did not establish that there would have been a different result because "the lack of capacity to transition" would be the same "even if the delays" were not present.

¶ 17    In sum, the record establishes that, despite the delays in setting up services for the paternal relatives, the Department still made reasonable efforts to build a relationship between them and the child. And in any event, even without the delays, the juvenile court found, with record support, that the result would have ultimately been the same. We therefore discern no error.

### III.   Less Drastic Alternatives

¶ 18    Father contends that the juvenile court erred by finding that there was no less drastic alternative to termination. We disagree.

### A.   Applicable Law and Standard of Review

¶ 19    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108,

1122-23 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007). Long-term placement may not be a viable alternative to termination if the child needs a stable, permanent home that can be assured only by adoption. *Z.P.*, 167 P.3d at 214.

¶ 20 To aid the juvenile court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of people the parent identifies as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department is not obligated to "independently identify and evaluate other possible placement alternatives." *Z.P.*, 167 P.3d at 215.

¶ 21 For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, it must be the "best" option for the child. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 27. Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order

termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *B.H.,* ¶ 80.

## B. Analysis

¶ 22 The record supports the juvenile court's finding that there was no less drastic alternative to termination. It is undisputed that father did not comply with his treatment plan, he was unfit, and his conduct or condition was unlikely to change in a reasonable time. *See A.M.,* ¶ 48 (noting that the parent did not challenge the propriety of the court's findings on the criteria in section 19-3-604(1)(c)); *see also People in Interest of A.R.,* 2012 COA 195M, ¶ 38 (permanent placement is not a viable alternative to termination if an ongoing relationship with the parent would not be beneficial). Several witnesses testified that the child needed a stable home, which could only be achieved through adoption. *See Z.P.,* 167 P.3d at 214. Finally, the caseworker testified that, even if the court approved placement with the paternal relatives, allocation of parental responsibilities (APR) with father was still not a viable option.

¶ 23    The record therefore shows that the juvenile court considered less drastic alternatives but rejected them because they were not in the child's best interests.  *See A.M.*, ¶ 32.  And because the record supports the court's finding, we cannot disturb it.  *See B.H.*, ¶ 80.

¶ 24    Father's appellate contention focuses entirely on the juvenile court's decision to reject placement with the paternal relatives. However, we need not address his contentions because the court found, with record support, that, even if it approved placement with the paternal relatives, an APR was not a less drastic alternative to termination.  In other words, even if father was correct about the court's placement decision, the court still properly rejected less drastic alternatives.  The record, as described above, otherwise indicates that the Department made efforts to investigate the paternal relatives for placement.  *See D.B-J.*, 89 P.3d at 532.  We therefore discern no basis for reversal of the termination judgment.

## IV.    Lack of Fundamental Fairness Based on Alleged Racial Bias and Discrimination

¶ 25    Father, who is Hispanic, argues that he was denied a fundamentally fair proceeding because of racial bias and discrimination against him and his family.  We disagree.

## A. Standard of Review and Preservation

¶ 26     We review procedural due process claims de novo. *People in Interest of C.J.*, 2017 COA 157, ¶ 25.

¶ 27     The Department and the guardian ad litem (GAL) assert that we should not address father's contention because he did not preserve it. Generally, in civil cases, such as dependency and neglect proceedings, appellate courts will "review only issues presented to and ruled on by the lower court." *People in Interest of M.B.*, 2020 COA 13, ¶ 14. A party is not required to use talismanic language to preserve an issue for appeal, *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18, but the party must still present to the juvenile court "the sum and substance of the argument" made on appeal, *Berra v. Springer and Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010).

¶ 28     In father's closing argument, he asserted that this was "a case about institutional racism" and that "institutional racism" was "alive and well and operating to disadvantage [father's] family." He then discussed several instances of alleged racial bias and discrimination that occurred during the case and asked the juvenile court to deny the termination motion on those grounds.

¶ 29    The Department and the GAL contend that, although father

mentioned "institutional racism," he did not argue that he was

denied his due process right to a fundamentally fair proceeding or

reference any law related to a due process violation.  True, father

did not specifically argue that his due process right to a

fundamentally fair proceeding had been violated, but we conclude

that his closing argument still presented the "sum and substance"

of the argument raised on appeal.  *See id.*  We therefore consider

the argument properly preserved for appellate review.

### B.    Applicable Law and Analysis

¶ 30    To prove a violation of due process, "one must first establish a

constitutionally protected liberty interest that warrants due process

protections."  *M.S. v. People*, 2013 CO 35, ¶ 22.  Because parents

have a fundamental liberty interest in the care, custody, and

control of their children, *A.M.*, ¶ 17, due process requires the

government to provide fundamentally fair procedures to a parent

facing termination, *A.M. v. A.C.*, 2013 CO 16, ¶ 28.

¶ 31    In termination proceedings, a parent is entitled to notice of the

hearing, advice of counsel, and the opportunity to be heard and

defend.  *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 40.  The

opportunity to be heard must be provided at a meaningful time and in a meaningful manner. *Patterson v. Cronin*, 650 P.2d 531, 537 (Colo. 1982). Generally, if the parent receives these procedural protections, then due process is satisfied. *See People in Interest of R.J.B.*, 2021 COA 4, ¶ 33.

¶ 32    In support of his argument, father describes several events that occurred during the case that illustrate the alleged bias of the Department, the juvenile court, and the GAL. These events include the following:

- The Department improperly delayed completion of the ICPC home study.

- The Department prevented the paternal relatives from having contact with the child until January 2023.

- The caseworker said that the Department would have likely placed the child with the paternal relatives if they had come forward in the first case.

- The Department delayed reintegration therapy for several months.

- The therapist contracted by the Department did not support reintegration therapy or placing the child with the paternal relatives.

- The Department refused to pay for the paternal relatives to travel from Texas to Colorado.

- The Department and the GAL objected to father's request for the child to have a Hispanic therapist, and the court denied the request.

- The court commented in a hearing that "[e]very appearance needs to be made in this case that [the paternal relatives are] being given a fair shot."

- The court found that the child's ability to form a secure attachment was more important than preserving her connection to her culture.

- The court found that the foster parents met the definition of kin in the Colorado Children's Code.

- The GAL argued on multiple occasions that the child should not be placed with the paternal relatives.

- The GAL assumed that a witness was from Mexico, even though she was from Colombia.

- In response to father's argument that it was important for the child to be connected to her Hispanic culture, the Department asserted that the child had a cultural connection to her foster parents through shared Native American heritage. In so doing, the Department showed cultural insensitivity because it treated the child's potential Apache and Cherokee heritage as culturally equivalent to the foster home's membership in the Choctaw tribe.[3] **TR 9/1/2023, pp 26-28**

¶ 33 Although some of these events are concerning, we conclude, for the following reasons, that father has not established that his due process right to a fundamentally fair proceeding was violated as a result.

¶ 34 First, the undisputed record shows that father was represented by counsel throughout the proceedings, received notice of what he was required to do to prevent a termination of his parental rights, and was provided the opportunity to present evidence and question adverse witnesses during the evidentiary

---

[3] The record also reflects that all eleven tribes notified by the Department indicated the child was not eligible for membership.

hearing, which lasted three days in total. We conclude he received the process he was due. *Id.* at ¶ 33.

¶ 35 Second, the record does not definitively show that the Department's actions were the result of racial bias and discrimination. For example, the record shows that at least some of the delays related to the ICPC were the result of negligence rather than malfeasance. Likewise, the delays in getting reintegration and visits set up were partially caused by delays on the paternal relatives' side. And nothing in section 19-3-208 required the Department to pay for the paternal relatives to travel to Colorado. Still, the caseworker testified that the Department did not object to providing travel funds but needed a court order first. The caseworker also explained that the paternal relatives had never asked the Department for funding before June 2023. Overall, father has not directed us to any specific statements that would indicate that these actions were based on the Department's bias toward father or his family.

¶ 36 Third, even if some of the Department's issues might have been caused by bias or discrimination, the juvenile court corrected those missteps. For instance, the court made a lack of reasonable

efforts finding based on the ICPC delays (which extended the length of the case), ordered visits to begin immediately even though the reintegration process had not moved forward, facilitated the removal of the child's therapist, and ordered the Department to pay for the paternal relatives to travel to Colorado. As for the request for a Hispanic therapist, father did not make that request until after the termination hearing had begun and the court denied it because changing therapists again at such a late date would not be in the child's best interests. Notably, father never asked the court to remove the Department or a caseworker because of a conflict of interest. *See People in Interest of T.D.*, 140 P.3d 205, 222 (Colo. App. 2006) (stating that a court may disqualify a county department and appoint a department of human services in another county if the department has a conflict of interest with the parents), *abrogated on other grounds by People in Interest of A.J.L.*, 243 P.3d 244 (Colo. 2010).

¶ 37    Fourth, father has not established that the juvenile court's rulings demonstrated racial bias or discrimination. Father points to adverse legal rulings in support of his argument, but we see nothing to suggest that they were improperly motivated. Instead, the

evidence presented to the court supported its decisions. Nor are we convinced that the judge demonstrated bias or discriminated against father's family by saying that the Department needed only to appear like it was giving the paternal relatives a "fair shot." As described above, the court's actions at every turn show that it pushed the Department to make every effort to establish a relationship between the paternal relatives and the child. Notably, father never moved to recuse the judge, *see People v. Jennings*, 2021 COA 112, ¶ 21 (a party waives a challenge to an appearance of partiality by failing to file a timely motion), and he does not assert on appeal that the judge should be disqualified for actual bias, *see People in Interest of A.P.*, 2022 CO 24, ¶ 28 (noting that the Code of Judicial Conduct requires disqualification when a judge has a personal bias or prejudice toward a party).

¶ 38     Finally, even if the original GAL was biased or she discriminated against father and his family, we discern no reversible error because that GAL was removed from the case for unrelated reasons after the first day of the hearing and replaced with a different GAL. And although the second GAL made many of

the same recommendations and requests as the first GAL, father does not take issue with the second GAL.

¶ 39    In sum, we are not convinced that father was denied a fundamentally fair proceeding.  Rather, father was afforded each of the required procedures described above during the termination proceeding.  For example, father received ample notice of the Department's intent to seek termination of his parental rights; he was always represented by counsel during the proceeding; and counsel cross-examined witnesses, presented evidence in support of father's case, raised timely objections, and made a closing argument asking the juvenile court to deny the motion to terminate father's parental rights.  Ultimately, father does not explain how any of these procedures were impacted by his claim of bias and discrimination.

## V.    Definition of Kin

¶ 40    Father maintains that the juvenile court misinterpreted the definition of kin in section 19-1-103(91) in deciding that the foster parents qualified as kin in this case.  We need not address the merits of his argument because any error is harmless.

¶ 41 An "appellate court may disregard any error or defect not affecting the substantial rights of the parties." C.A.R. 35(c). An error affects a substantial right only if it can be said with fair assurance that it substantially influenced the outcome of the case or impaired the basic fairness of the trial. *People in Interest of C.C.*, 2022 COA 81, ¶ 20.

¶ 42 Recall that the juvenile court considered both the change of placement and the termination motions simultaneously and therefore made rulings on both motions following the hearing. In its ruling, the court considered each of the factors in section 19-3-702(6) when it declined to place the child with the paternal relatives. Section 19-3-702(6)(h) provides that the court should consider the "possible effects" on the child's "emotional well-being" if the child were to be "removed from the caregiver's home," but it must not deny placement with a child's "relative or kin" based "solely upon the ordinary bonding and attachment to a foster parent as a result of time spent in the home." In this context, the court found that the foster parents qualified as kin under the definition in the Children's Code. *See* § 19-1-103(91) (defining kin

22

to include "a person who has a prior significant relationship with the child").

¶ 43    The juvenile court's interpretation of the definition of kin did not impact the outcome of the case for two reasons. First, father is appealing the termination of his parental rights, not the denial of the placement motion. And as explained in Part III.B. above, the court's decision to deny the paternal relatives' motion for change of placement did not affect its determination that there was no less drastic alternative to termination. Second, even if the placement decision somehow influenced the termination, the court's analysis of section 19-3-702(6)(h) did not end with its decision that the foster parents met the definition of kin. Rather, the court acknowledged that "the spirit of the sentence" probably required it to consider the foster parents in the case as foster parents rather than kin and therefore it conducted the analysis as required by section 19-3-702(6)(h).

¶ 44    In sum, any error related to the juvenile court's interpretation of the definition of kin in section 19-1-103(91) was harmless, and we therefore discern no basis for reversal.

## VI.   Disposition

¶ 45    The judgment is affirmed.

JUDGE GROVE and JUDGE LUM concur.