25CA0425 Peo in Interest of EG-M 11-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0425
El Paso County District Court No. 20JV866
Honorable Lin Billings Vela, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of E.G-M. and V.G-M., Children,

and Concerning F.E.G.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Sullivan and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

---

Kenneth R. Hodges, County Attorney, Shannon Boydstun, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In this dependency and neglect case, F.G. (father) appeals the judgment terminating his parental rights to E.G-M. and V.G-M. (the children).  We affirm.

## I.     Background

¶ 2     In September 2020, the El Paso County Department of Human Services (Department) filed a petition in dependency and neglect regarding the children.  The petition alleged that the children were living with G.M., their alleged father at the time, and were experiencing medical neglect and living in an unsanitary and unsafe home.  The Department placed the children into foster care, where they remained for the remainder of the case.

¶ 3     In August 2021, mother reported that she didn't believe G.M. was the children's biological father.  Father was eventually located in a prison in Texas operated by the Texas Department of Corrections (TDOC).  Father remained incarcerated in a TDOC facility throughout the remainder of the case.

¶ 4    The court held a contested paternity hearing and father was adjudicated the legal father of the children.[1]  Father admitted to the allegations in the petition and the court adjudicated the children dependent and neglected.  A treatment plan was then adopted for father.

¶ 5    Later, the Department moved to terminate parental rights. Following a two-day evidentiary hearing that occurred over the course of a year, the juvenile court granted the motion and terminated father's parental rights.

## II.    Reasonable Efforts

¶ 6    Father asserts that the Department failed to provide reasonable efforts because it didn't facilitate regular family time or obtain information about the treatment services available to him at the facility where he was incarcerated.  We aren't persuaded.

### A.    Standard of Review and Applicable Law

¶ 7    Before a juvenile court may find a parent unfit, the county department of human services must make reasonable efforts to

---

[1] G.M. appealed the paternity adjudication, which was upheld on appeal by another division of this court in the unpublished opinion *People in Interest of E.G-M.*, (Colo. App. No. 23CA1142, July 25, 2024) (not published pursuant to C.A.R. 35(e)).

rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. Reasonable efforts mean the "exercise of diligence and care" to reunify parents with their children. § 19-1-103(114).

¶ 8 Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard. § 19-1-103(114). Among the services required under section 19-3-208 are screenings, assessments, and individual care plans for the provision of services; home-based family and crisis counseling; information and referral services available to public and private assistance resources; family time; and placement services. § 19-3-208(2)(b).

¶ 9 The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 10 Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and

law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  We review the juvenile court's factual findings for clear error and review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation.  *Id.*

### B.  Analysis

¶ 11  The juvenile court found that the Department made reasonable efforts to reunify father with the children.  The record supports the juvenile court's findings.

¶ 12  As father asserts, the Department never provided him with regular family time with the children.  The caseworker admitted that she was only able to secure a single ten-minute phone visit throughout the life of the case.  However, the record demonstrates that this was due to action or inaction on the part the TDOC facility where father was incarcerated and father's noncooperation, not the Department's lack of efforts.

¶ 13  The record shows that the caseworker tried throughout the case, without success, to set up family time for father.  The caseworker testified that she regularly and repeatedly contacted the facility where father was incarcerated by phone and email to inquire about family time.  The caseworker reported that she would either

not receive a response or wouldn't receive clear information about how to facilitate family time. Eventually, the caseworker learned that the facility wouldn't allow father to have any family time while his status at the facility was highly restricted. Father's restriction status wasn't lowered until roughly four months prior to the final termination hearing. Once father's restriction status was lowered, the facility reported that he still needed to update his information to include the children on his family list and family tracking page before family time could be implemented. At the time of the final termination hearing, the caseworker reported father had still not yet provided the facility with the required information despite knowing for at least two to three months that it was needed before family time could be set up. Thus, it was father's lack of effort and the facility's noncooperation that precluded father from having regular family time.

¶ 14    Nevertheless, father points us to the provisions of Senate Bill 23-039 (S.B. 23-039), which provides specific guidance and directives to help navigate the provision of family time services for incarcerated inmates in support of his argument that the Department failed to make reasonable efforts. It's true that S.B.

23-039 provides that if in-person family time isn't reasonably practicable, a caseworker must communicate with a facility or jail to learn about their ability to facilitate virtual family time. § 19-3-507(1)(f)(I)(B), C.R.S. 2025. The caseworker did just that, learning that his facility wouldn't allow family time while his status was "highly restricted," and that once his restricted status was amended, he had to add the children to his family list in order to have family time — which he never did. Moreover, father points to no authority, and we aren't aware of any, that would allow the Department to force an out-of-state facility to provide family time visitation.

¶ 15    Father next contends the Department didn't make reasonable efforts because it didn't provide him with services while he was incarcerated. Again, however, the record shows it was the facility's lack of services, not the Department's lack of efforts, that prevented father from accessing services.

¶ 16    The caseworker testified that when she inquired about services available at the facility where father was incarcerated, the facility reported that they had mental health services focused on

medication management. The facility ultimately reported that they didn't have any treatment services available for father.

¶ 17     Still, father asserts the Department violated section 19-3-508(1)(e)(III), C.R.S. 2025, by failing to provide regular updates on services available to him. That statute states that "[i]f, after the dispositional hearing, the child's parent becomes continuously incarcerated in a department of corrections facility," the caseworker "shall provide information that details the services and treatment available to a parent" or "the caseworker's efforts to obtain the information." § 19-3-508(1)(e)(III). True, it does not appear that the caseworker regularly updated the court about her efforts to obtain information on services available to father. But, as described above, the caseworker testified that communication with the facility proved difficult.

¶ 18     Regardless, even if we assumed, without deciding, that this provision applies when a parent is incarcerated in another state and that the caseworker fell short of her statutory obligations by failing to provide the court with updates as to the services available to father while incarcerated during court hearings as required by section 19-3-508(1)(e)(III), any such failure to comply with the

7

statute would be harmless because the record shows that no pertinent services were available to father at the TDOC facility where he was incarcerated.

¶ 19    Given this record, we conclude that the juvenile court didn't err in finding the Department provided reasonable efforts to reunify father with the children.

### III.    Treatment Plan Compliance and Incarceration as a Basis for Termination

#### A.    Standard of Review and Applicable Law

¶ 20    As relevant here, before the juvenile court terminates parental rights under section 19-3-604(1)(c), it must find, by clear and convincing evidence, that (1) the parent is unfit and (2) the parent's conduct or condition is unlikely to change in a reasonable period of time.  § 19-3-604(1)(c).

¶ 21    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provides nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and

conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 22 The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required the government's intervention. *K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006). A treatment plan is successful if it either renders a parent fit or corrects the conduct or condition that led to state intervention. *People in Interest of C.A.K.*, 652 P.2d 603, 611 (Colo. 1982).

¶ 23 The fact that a treatment plan wasn't successful doesn't mean that it was inappropriate, as in many cases it's virtually impossible to devise a plan that will guarantee success, *People in Interest of M.M.*, 726 P.2d 1108, 1121-22 (Colo. 1986), and on appeal father doesn't challenge the appropriateness of the treatment plan as adopted at the dispositional hearing.[2] In any event, it's well-

_____

[2] Father also makes an appropriate treatment plan/abuse of discretion argument, essentially asserting that the juvenile court devised a new treatment plan in its ruling on his treatment plan compliance at the termination hearing. But because father agrees that the treatment plan was appropriate as written, and because the court's ruling on father's treatment plan is addressed below, we don't address this argument separately.

established that although absolute compliance with a treatment plan isn't required, partial or even substantial compliance may not be sufficient to render a parent fit. *People in Interest of K.B.*, 2016 COA 21, ¶ 26.

¶ 24 If a child is under six years old at the time the petition in dependency or neglect is filed, the court "shall not find" that a parent has reasonably complied with a court-approved treatment plan if the parent (1) exhibits the same problems addressed in the treatment plan without adequate improvement and (2) is unable or unwilling to provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. § 19-3-604(1)(c)(I)(B).

¶ 25 Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, and we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

### B. Treatment Plan Compliance

¶ 26 Father asserts that he substantially complied with his treatment plan as written and that the juvenile court abused its

discretion when it "attempt[ed] to rewrite the treatment plan to include additional objectives or criteria without an opportunity [for father] to comply with them." While we agree that the juvenile court erred — and even assuming that the court's error was of constitutional magnitude — we nevertheless conclude the error was harmless beyond a reasonable doubt. *See People In Int. of T.M.S.,* 2019 COA 136, ¶ 26 (recognizing that "[o]ur supreme court has not addressed whether the constitutional harmless error standard applies with respect to a parent's constitutional rights in dependency or neglect proceedings, but nevertheless applying it and finding the juvenile court's error harmless beyond a reasonable doubt) (first citing *A.M. v. A.C.,* 2013 CO 16, ¶ 16 n.10, then citing *People v. Trujillo,* 114 P.3d 27, 32 (Colo. App. 2004)).

¶ 27    Father's treatment plan, as adopted at the dispositional hearing, required him to (1) cooperate with the Department, the court, and the guardian ad litem; (2) "have consistent visitation with his children to maintain their bond" once he was released from incarceration; and (3) refrain from picking up any new criminal convictions and address any pending charges "in order to be available to parent his children."

11

¶ 28    At the termination hearing, the juvenile court found that, with regard to the first objective, father was "minimally compliant and sufficiently compliant," but that his compliance wasn't successful in rehabilitating him.

¶ 29    Similarly, the juvenile court found that father was "technically" compliant with objective two as it was written, but that "[o]bviously, everyone was working towards this objective being an active visitation objective" and it further noted that "we haven't been able to even begin work on [father] establishing a relationship with his children."

¶ 30    Finally, regarding the third objective, the juvenile court again found father "technically" compliant because he picked up new charges *prior* to the treatment plan's adoption, not after. Nevertheless, the court indicated that it "believe[d] the purpose of objective number three is that [father] will do his measured best while at [the Texas] Department of Corrections, in order to comply with a release such that he could become available to parent his children." Therefore, the court found that "there's an argument to be made that he violated objective number three."

¶ 31    Overall, the court found that while an appropriate treatment plan had been drafted and father had primarily complied with its components, it wasn't successful in rehabilitating him, and he was unfit.  *See K.B.*, ¶ 26 ("partial, or *even substantial compliance*, may not be sufficient to render the parent fit."  (Emphasis added.)).

¶ 32    We agree with father that the court's finding "that [father] violated objective number three," was erroneous.  The record shows father's new criminal charges happened *before* his treatment plan was adopted and thus it was inappropriate for the court to consider the new charges to be a violation of this treatment plan component.  Nevertheless, for reasons further described below, we conclude the court's error was harmless beyond a reasonable doubt.

¶ 33    "An error is harmless beyond a reasonable doubt if there is no reasonable possibility that the error prejudiced the appellant."  *T.M.S.*, ¶ 26 (citing *People v. Trujillo*, 114 P.3d 27, 32 (Colo. App. 2004)).  To be sure, the record shows that father had substantially complied with the components of his treatment plan.  Nevertheless, our review of the record convinces us that there is no reasonable possibility that the outcome of the proceeding would have been different had the court concluded that father substantially complied

with the treatment plan as adopted at the dispositional hearing (and not, as father argues, amended it at the termination hearing). *See T.M.S.*, ¶ 27. This is because, as discussed below, the record overwhelmingly supports the conclusion that, notwithstanding his substantial compliance with the treatment plan as adopted at the dispositional hearing, the treatment plan wasn't successful in rehabilitating father and thus termination was the proper result. *See* § 19-3-604(1)(c); *K.B.*, ¶ 26.

¶ 34 The caseworker opined that father had not developed a relationship or bond with the children. The caseworker noted that father had previously had a mandatory release date in 2026 until he received an additional conviction while incarcerated that resulted in his mandatory release date being pushed to 2032. She further posited that father was incarcerated "due to his actions" and while his incarceration wasn't why the case was opened, it was what directly prevented father from being able to reunify with his children.

¶ 35 Most importantly, the caseworker opined that the children needed permanency and that she didn't believe it was in the children's best interests to keep the case open any longer. The

14

caseworker reported that the children had complex medical and emotional needs that required considerable treatment. V.G-M. was diagnosed with reactive attachment disorder and autism spectrum disorder, required leg braces, and was engaged in individual therapy. E.G-M. "ha[d] a long list of medical diagnos[es] and needs" that required, among other things, that he have a G-tube, a helmet, foot lifts, and a speech assistance machine. He underwent several surgeries throughout the case, and more surgeries were likely to occur in the future. Both children were involved in equine therapy, speech therapy, occupational therapy, and applied behavior analysis therapy. The caseworker reported that father had never expressed any interest in the children's medical appointments, nor did he regularly inquire about the children's well-being. Father himself agreed he wasn't currently able to care for the children or meet their needs.

¶ 36    The caseworker further opined that even if father was immediately released, he wouldn't be able to safely parent his children. *See* § 19-3-604(1)(c)(I)(B). She noted that father currently resides in another state and that she didn't believe, given father's criminal history, that Texas would approve an Interstate Compact

15

on the Placement of Children home study, and thus the Department would have to look at moving father to Colorado, which could be complicated by his parole status once released. Even once father was in Colorado — assuming that could be achieved — the Department would still need to formulate a new appropriate treatment plan, enroll him in services, train him on the children's medical needs, and begin reintegration services. The caseworker opined that after his release it would take another year, at a minimum, for father to be rehabilitated and to establish a relationship with his children.

¶ 37 Additionally, because the children were less than six years old when the petition in dependency and neglect was filed, the expedited permanency planning (EPP) guidelines apply. *See* §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025. The EPP provisions require that such children be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25. At the time of the final termination hearing, the children had already been in their current foster care placement for over 900 days and the EPP case had been ongoing for over four years. Father's mandatory

release date was in 2032, and the caseworker didn't believe it was in the children's best interests to remain without permanency until his release.

¶ 38 Finally, the record establishes that father didn't even take the minimal steps that were available to him to establish some relationship with the children or demonstrate an interest in their well-being. For example, father never added the children to his family list or family tracking page, which was a prerequisite to setting up family time once his restriction status was lowered. Moreover, the caseworker suggested father could have written letters to the children or the caseworker using the pre-stamped envelopes the caseworker had sent him. But father didn't, testifying that inmates in his TDOC facility can't have self-stamped envelopes mailed to them. And no one, including father, testified that father ever inquired about the children's well-being or their medical needs.

¶ 39 Thus, given the overwhelming evidence in the record that supports the juvenile court's finding that father is unable or unwilling to provide nurturing and safe parenting adequate to meet the children's needs, any error the court made when it determined

17

father didn't comply with the treatment plan was harmless beyond a reasonable doubt. *See T.M.S.*, ¶¶ 25, 29 (assuming constitutional harmless error applies to juvenile cases, the error was harmless beyond a reasonable doubt when "ample evidence" supported that the mother would remain unfit regardless of the alleged juvenile court's error).

### C.    Incarceration as a Basis for Termination

¶ 40    Lastly, father contends that the juvenile court "*de facto* resurrected [a] deleted statutory provision" through which the court inappropriately "allow[ed] termination based solely on incarceration." We disagree.

¶ 41    As father asserts, the legislature in 2023 repealed subsection (1)(b) of 19-3-604, which allowed consideration of a parent's long-term confinement status in termination of parental rights. *See* Ch. 191, sec. 7, § 19-3-604, 2023 Colo. Sess. Laws 957 (repealing former section 19-3-604(1)(b)(III)). In its ruling, the juvenile court also acknowledged "that the general assembly removed [that subsection], and the [c]ourt cannot consider long-term incarceration of the parent alone for purposes of termination." Still, the court didn't believe "it was the intent of the general assembly

that the [c]ourt ignore long term incarceration of the parent, especially when we are to consider and give primary consideration to the physical, mental, and emotional conditions and needs of these very high-needs children."

¶ 42     Indeed, S.B. 23-039's legislative declaration states, in relevant part, that "decisions to terminate parental rights should be based on the needs of the child, and not *solely* on the status of the parent as incarcerated or the length of the sentence."  2023 Colo. Sess. Laws at 953 (emphasis added).  In other words, the General Assembly confirmed that, while a parent's incarceration can't be the *sole* reason for termination, it may still be considered as one of the factors in a juvenile court's decision.

¶ 43     The court noted it wasn't "hanging [its] hat on long term incarceration for [its] findings."  Thus, the court explicitly noted its judgment was *not* based exclusively on father's incarceration.  The court further indicated its concern that father "did not know the dates of birth of his children" and that the court "heard zero evidence, from [father's] testimony to the caseworker, that he's reached out or in any way tried to learn about these children, learn more about their special medical [and] emotional needs."  While the

court believed father "is sincere in his wanting to be an available parent," the court found that "these children cannot wait any longer for [father] to become an available parent, let alone complete the kind of work that needs to be done to establish a relationship with his children." The record supports the court's findings, which are, at least in part, independent of and in addition to the fact that he was incarcerated.

¶ 44　As described above, the caseworker didn't believe father could safely parent his children at the time of termination. The caseworker further opined that the case was an EPP case that had already been open for over four years, that the children needed permanency, and that it wasn't in the children's best interests to keep the case open any longer. She noted that father hadn't expressed any interest in the children's medical appointments, nor did he regularly inquire about their well-being. And father himself admitted that he wasn't able to currently care for the children.

¶ 45　Therefore, although the record shows that father's incarceration during the case *informed* the juvenile court's decision, it wasn't the *sole* reason that the court found him unfit. *See K.D.*, 139 P.3d at 703 (The court did not err when it "carefully considered

how [the parent's] continued incarceration affected his fitness and his corresponding ability to meet [the child's] needs within a reasonable time."). We therefore reject father's assertion.

## IV. Disposition

¶ 46 The judgment is affirmed.

JUDGE SULLIVAN and JUDGE BERGER concur.